UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

DAVID AKO-ANNAN,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        No. 1:19-cv-00544-JAW
                                    )
EASTERN MAINE MEDICAL               )
CENTER                              )
                                    )
            Defendant.              )

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

For six years, a man born in Ghana managed a healthcare practice in central Maine owned by a local hospital. The man was the only African American and only male primary care practice manager for his employer. Although the man generally had favorable performance reviews, tensions arose among him, his supervisor, and a number of employees at the practice. In 2019, the primary care practice fired the man, causing him to sue his former employer under Title VII of the Civil Rights Act of 1964 (Title VII) for race and sex discrimination and the Maine Whistleblower Protection Act (MWPA). The employer moves for summary judgment. The Court denies the motion because genuine issues of material fact preclude summary judgment.

I.    **PROCEDURAL HISTORY**

On October 31, 2019, David Ako-Annan filed a three-count complaint in Penobscot County Superior Court in Bangor, Maine against his former employer, Eastern Maine Medical Center (EMMC), alleging violations of the Maine Human

Rights Act, the Maine Whistleblower Protection Act, and Title VII of the Federal Civil Rights Act. *State Ct. R.*, Attach. 1, *Compl.* (ECF No. 2); *id.*, Attach. 2, *Docket R.* On November 29, 2019, EMMC removed this case to federal court. *Notice of Removal* (ECF No. 1). On December 20, 2019, EMMC answered the Complaint. *Answer to Compl.* (ECF No. 6).

On October 27, 2020, EMMC notified the Court that it intended to move for summary judgment and requested that the Court schedule a Local Rule 56(h) prefiling conference. *Notice of Intent to File Mot. for Summ. J.* (ECF No. 20). On November 17, 2020, EMMC filed its Local Rule 56(h) memorandum. *Def.'s Pre-Filing Conference Mem.* (ECF No. 22). On November 20, 2020, Mr. Ako-Annan submitted his Local Rule 56(h) memorandum and stated he intended to withdraw the retaliation claim alleged in Count I of the Complaint. *Pl.'s Resp. to Def.'s Pre-Filing Conference Mem.* at 1-2 (ECF No. 23).

On December 14, 2020, the Court held the Local Rule 56(h) conference. *Min. Entry* (ECF No. 24). On December 18, 2020, the Court issued an order on two issues raised at the Local Rule 56(h) conference. *Order* (ECF No. 25). First, the Court dismissed with prejudice Mr. Ako-Annan's claims "arising out of any alleged discrimination that may have occurred during the course of [his] employment with [EMMC] in 2013." *Id.* at 1. Second, it dismissed with prejudice Mr. Ako-Annan's "claim for alleged retaliation (Count I in the Complaint) directed at him by [EMMC] arising out of [Mr. Ako-Annan's] involvement as a witness in the 'L.R. Litigation.'" *Id.*

On January 15, 2021, EMMC filed the Local Rule 56(h) stipulated record. *Stipulated Facts* (ECF No. 26) (*R.*); *id.*, Attachs. 1-10. On January 25, 2021, EMMC filed its motion for summary judgment and statement of material facts. *Def. Eastern Maine Medical Center's Mot. for Summ. J.* (ECF No. 29) (*Def.'s Mot.*); *Def.'s Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J.* (ECF No. 30) (DSMF).

On February 23, 2021, Mr. Ako-Annan responded in opposition to EMMC's motion for summary judgment. *Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 32) (*Pl.'s Opp'n*). That same day, he also filed his response to EMMC's statement of material fact and his additional statement of material facts in the same document. *Pl.'s Resp. to Def.'s Statement of Material Facts* (ECF No. 31) (for paragraphs 1-74, PRDSMF; for paragraphs 75-251, PSAMF). On March 19, 2021, EMMC replied to Mr. Ako-Annan's opposition to summary judgment and to his responsive statement of facts. *Def.'s Reply in Supp. of Mot. for Summ. J.* (ECF No. 35) (*Def.'s Reply*); *Def.'s Reply to Pl.'s Additional Facts and Resp. to Pl.'s Reqs. to Strike Statements of Fact* (ECF No. 36) (DRPSAMF).

## II.    FACTUAL BACKGROUND

In keeping with "the conventional summary judgment praxis," the Court "recount[s] the facts in the light most hospitable to [Mr. Ako-Annan's] theory of the case, consistent with record support." *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002) (citation omitted).

## A.     The Parties

David Ako-Annan is an African American Black[1] male born in Ghana.  PSAMF ¶ 93; DRPSAMF ¶ 93.  Mr. Ako-Annan holds a bachelor's degree in Food Science and Nutrition, a Master of Business Administration (MBA) in Healthcare Management, and a master's degree in Human Relations Counseling.  PSAMF ¶ 94; DRPSAMF ¶ 94.

EMMC is a four-hundred-eleven-bed hospital that provides services to communities in central, eastern, and northern Maine.  *R.* ¶ 1.  In addition to operating the hospital on its main campus in Bangor, EMMC operates several outpatient practices including primary care practices in Bangor, Brewer, Hampden, and Orono, Maine.  *R.* ¶ 2.

## B.     2013-2015: EMMC Hires David Ako-Annan to Manage the Orono Primary Care Practice

In 2013, while interning for EMMC, Mr. Ako-Annan submitted a complaint of race discrimination by co-workers; however, EMMC took no action to address his complaint.  PSAMF ¶ 95; DRPSAMF ¶ 95.  On June 12, 2013, EMMC hired Mr. Ako-Annan as the office manager at the Orono Primary Care Practice (the Orono Practice).  *R.* ¶ 3.  On November 3, 2013, EMMC changed Mr. Ako-Annan's title to practice manager, but his compensation and duties remained the same.  *R.* ¶ 4.  As practice manager, Mr. Ako-Annan was responsible for ensuring the smooth operation

---

[1]     In this opinion, the Court adopted the modern convention that Black when referring to race should be capitalized and white when referring to race should not. The Court adjusted the parties' submissions to conform to this somewhat new convention.

of the practice and hiring staff. *R.* ¶¶ 5-6. He was also responsible for staff morale. DSMF ¶ 1; PRDSMF.[2]

All members of EMMC's leadership team, including the practice director for primary care are responsible for various issues within the primary care practices. PSAMF ¶ 135; DRPSAMF ¶ 135. A practice manager needs support from upper management to accomplish his or her objectives. PSAMF ¶ 136; DRPSAMF ¶ 136. EMMC's Director of Physician Services supervises its practice managers. *R.* ¶ 7. Kathy Lavallee was the Director of Physician Services from Mr. Ako-Annan's hiring through May 2015, when Donna Ashe assumed the position. *R.* ¶ 8.

### C.  2015-2016: Donna Ashe Replaces Kathy Lavallee as Director of Physician Services

In May 2015, Donna Ashe replaced Ms. Lavallee as Director of Physician Services. *R.* ¶ 8. Ms. Ashe supervised five practice managers. *R.* ¶ 9. Of the six primary care practices in the greater Bangor area, Mr. Ako-Annan was the only male practice manager and only non-white practice manager during Ms. Ashe's tenure as Director of Physician Services. PSAMF ¶¶ 81-82. Ms. Ashe made the final decision on who to hire as primary care practice managers, and EMMC has not performed any inquiry into why Ms. Ashe was hiring only female practice managers. PSAMF ¶ 88-89; DRPSAMF ¶¶ 88-89. In various conversations with Ms. Ashe, Mr. Ako-Annan brought up the fact that there was not a lot of diversity or focus on diversity at EMMC. PSAMF ¶ 83; DRPSAMF ¶ 83.

---

[2]     Mr. Ako-Annan interposes a qualified response to DSMF ¶ 1. The qualification is superfluous because Mr. Ako-Annan asserted the qualifying facts in his own statement of facts and the Court includes those facts elsewhere in this order. *See, e.g.*, PSAMF ¶ 135; PSAMF ¶ 137.

Initially, Mr. Ako-Annan believed he had a good relationship with Ms. Ashe. DSMF ¶ 2; PRDSMF ¶ 2. Early in Ms. Ashe's tenure, Mr. Ako-Annan filled in as the interim practice manager at EMMC's Husson Family Medicine practice in Bangor while also performing his duties at the Orono Practice. PSAMF ¶¶ 98-99; DRPSAMF ¶¶ 98-99. Ms. Ashe did not ask Mr. Ako-Annan whether he was interested in pursuing the open position at Husson Family Medicine, he did not apply for the position, and he was not hired for the position.[3] PSAMF ¶¶ 98-99; DRPSAMF ¶¶ 98-99.

Eventually, EMMC hired a white female, C.G., to manage the Husson Family Medicine practice. PSAMF ¶ 100; DRPSAMF ¶ 100. C.G. stayed in this position for one year before D.L. replaced her in 2018. PSAMF ¶ 100; DRPSAMF ¶ 100. At that time, D.L. had an overall performance score of 2.8 in her previous position in patient relations. PSAMF ¶ 101; DRPSAMF ¶ 101.

## D. December 2016: The Relationship Between David Ako-Annan and Donna Ashe Starts to Deteriorate

The relationship between Mr. Ako-Annan and Ms. Ashe began to deteriorate in December 2016 when the pair met to discuss Mr. Ako-Annan's annual performance evaluation. DSMF ¶ 3; PRDSMF ¶ 3. Mr. Ako-Annan did not believe this evaluation was accurate. DSMF ¶ 3; PRDSMF ¶ 3. When Mr. Ako-Annan raised his concerns, Ms. Ashe questioned his intelligence and Mr. Ako-Annan "expressed to her that [he] felt like there [was] a double standard" applied to him. DSMF ¶ 4; PSMF ¶ 4. At

---

[3]     EMMC interposes a qualified response that Mr. Ako-Annan did not apply to be the practice manager at Husson Family Medicine. DRPSAMF ¶ 98. The Court accepts the qualification.

that time, Ms. Ashe understood Mr. Ako-Annan was suggesting that he was perceiving some unfairness toward him because of his race or gender.  PSAMF ¶ 111; DRPSAMF ¶ 111.  In response, Ms. Ashe said that she was not treating Mr. Ako-Annan differently and that she had a Black foster child so there was no way she would not like Mr. Ako-Annan.  DSMF ¶ 4; PRDSMF ¶ 4; PSAMF ¶ 104; DRPSAMF.[4]  Mr. Ako-Annan found this statement offensive.  DSMF ¶ 4; PRDSMF ¶ 4.  EMMC's director of human resources, Alison Worster, agreed in an October 15, 2020, deposition that Ms. Ashe's comment about having a Black foster child was inappropriate.  PSAMF ¶ 106; DRPSAMF ¶ 106.

Ms. Ashe ended the performance review by telling Mr. Ako-Annan that he is very smart, has numerous credentials and qualifications, dresses professionally, perhaps even more professionally than most of EMMC's vice presidents, and that he had outgrown his position and should consider pursuing another position within EMMC.  DSMF ¶ 5; PRDSMF ¶ 5; PSAMF ¶ 102; DRPSAMF ¶ 102.  Mr. Ako-Annan interpreted these comments by Ms. Ashe as suggesting that he look for another job within EMMC.  PSAMF ¶ 103; DRPSAMF ¶ 103.  Mr. Ako-Annan informed Ms. Ashe

---

[4]    Mr. Ako-Annan's proffered statement of fact on this issue reads, "During the discussion, Ms. Ashe explained she had a foster child who was Black so there was no way she would not like him." PSAMF ¶ 104.  In support, Mr. Ako-Annan cites his deposition testimony at page 54 line 24 through page 55 line 1.  *Id.*  EMMC denies this assertion because Mr. Ako-Annan's deposition testimony actually reads: "She said she has a foster child who is Black. She is not treating me differently, but an actual fact she has a foster child who is black."  DRPSAMF ¶ 104.  EMMC is correct and the Court agrees that Mr. Ako-Annan's deposition testimony does not support the assertion. *See* DSMF, Attach. 1, *Dep. of David Ako-Annan* at 54:22-55:1 (*Ako-Annan Dep.*).  However, Mr. Ako-Annan also cited PSAMF, Attach. 13, *Mem. of David Ako-Annan* (May 24, 2017) at 11 (*Ako-Annan Mem.*), which reads "Donna tried to explain herself by saying that she has a foster child who is Black so there is no way she will not like me."  The Court overrules EMMC's denial and deems the fact admitted under Local Rule 56(f).

that he wanted to meet with her supervisor, Michael Reid, and emailed Mr. Reid on December 2, 2016.  PSAMF ¶ 105; DRPSAMF ¶ 105.  On December 13, 2016, Mr. Ako-Annan met with Mr. Reid and informed him that his supervisor was discriminating against him, not supporting him, and was suggesting that he look for other jobs.  PSAMF ¶ 112; DRPSAMF ¶ 112.[5]

Ms. Ashe also emailed Mr. Reid about her December 2016 meeting with Mr. Ako-Annan.  PSAMF ¶ 107; DRPSAMF ¶ 107.  Ms. Ashe wrote: "this is becoming uncomfortable as he gets off course and starts talking 'diversity.'"  PSAMF ¶ 107; DRPSAMF ¶ 107.  The reason that Ms. Ashe communicated with Mr. Reid about her meeting with Mr. Ako-Annan was about the substance of the last line of the memorandum in which Mr. Ako-Annan raised the subject of diversity, which made her uncomfortable.  PSAMF ¶ 108; DRPSAMF ¶ 108.  In her deposition, Ms. Ashe testified that she was uncomfortable talking about diversity with Mr. Ako-Annan because "the conversation did not have anything to do with diversity, it was talking about [Mr. Ako-Annan's] 360 (an evaluation tool) and his evaluation."  PSAMF ¶ 109; DRPSAMF ¶ 109.  According to EMMC, it is appropriate for a minority employee to raise the issue of diversity within an annual performance review.  PSAMF ¶ 110; DRPSAMF ¶ 110.

### E.   March 2017: A.S. Informs David Ako-Annan About the Use of a Racial Slur

---

[5]      Although EMMC admits the statement, it objects that the evidence underlying this factual assertion "is hearsay, is not under oath and should be stricken."  DRPSAMF ¶ 112.  The Court overrules EMMC's evidentiary objection.  Even if the statement is hearsay, it is admissible under several hearsay exceptions.

S.N. was the clinical lead for the Orono Practice. *R.* ¶ 10. A.S., M.G., and L.T. were medical assistants who worked at the Orono Practice at times relevant to this lawsuit. *R.* ¶ 11. On March 7, 2017, A.S., a Native American, told Mr. Ako-Annan that S.N. was retaliating against her, and that S.N. and L.T. had directed a racial and ethnic slur at her and continued to make fun of her after she asked them to stop. PSAMF ¶ 84; DRPSAMF ¶ 84. A.S. later left her job at the Orono Practice and told Mr. Ako-Annan she left because S.N. disliked her. PSAMF ¶ 85; DRPSAMF ¶ 85.[6] Ms. Ashe was not aware of A.S.'s concerns about racial or ethnic discrimination. PSAMF ¶ 86; DRPSAMF ¶ 86. Alison Worster, EMMC's Vice President of Human Resources, was not made aware of the March 2017 issue in which A.S. complained to Mr. Ako-Annan about S.N. PSAMF ¶ 87; DRPSAMF ¶ 87.[7]

### F. May 2017: EMMC Investigates David Ako-Annan for the First Time

In May 2017, Mr. Ako-Annan was aware that staff at the Orono Practice were making complaints about him and that there were morale issues at the practice. DSMF ¶ 6; PRDSMF ¶ 6. Mr. Ako-Annan also knew that as practice manager, he

---

[6]     EMMC objects that "[t]he citation provided to support this fact – a memorandum prepared by Plaintiff as to what A.S. told him is hearsay and should be stricken." DRPSAMF ¶ 85. The Court sustains the objection but admits the statement to establish notice to Mr. Ako-Annan as to why A.S. left the Orono Practice, not for its truth, and its impact on Mr. Ako-Annan as to his own perception that Ms. Ashe might have been discriminating against him due to his race.

[7]     The Court rejects Mr. Ako-Annan's broad statement of fact on this issue that "The H.R. Investigator who ultimately terminated Mr. Ako-Annan, Alison Worster Esq., did not know whether or not there were other employees at Orono who had raised concerns about race or ancestry discrimination." PSAMF ¶ 87 (citing *Dep. of Eastern Maine Medical Center* at 32:24-33:3 (ECF No. 41) (*EMMC Dep.*)). The record citation does not support Mr. Ako-Annan's broad assertion, and supports only that Vice President Worster was not made aware of the March 2017 incident involving A.S. *EMMC Dep.* at 33:3.

was responsible for addressing the morale issues. DSMF ¶ 6; PRDSMF ¶ 6.[8]  To address the staff issues at the Orono Practice, Ms. Ashe and Stephanie Baillageron, EMMC's Director of Clinical Services for the Orono Practice, met with staff at the Orono Practice to gather information.  DSMF ¶ 7; PRDSMF ¶ 7.

On May 10, 2017, Ms. Ashe and Ms. Baillageron met with staff at the Orono Practice.  DSMF ¶ 8; PRDSMF ¶ 8.  The staff relayed several complaints about Mr. Ako-Annan that Ms. Ashe summarized in her meeting notes.  DSMF ¶ 8; PRDSMF ¶ 8.  According to Ms. Ashe's notes, staff complained they felt unsupported, that they did not feel valued as team members, that Mr. Ako-Annan was condescending, yelling on a daily basis, sometimes yelling "I am the manager," or punching his fist into his hand, that Mr. Ako-Annan demanded respect but did not respect others, that Mr. Ako-Annan reprimanded his staff in front of other staff, and that he talked about private matters in front of others.  DSMF ¶ 9; PRDSMF ¶ 9.[9]  According to Ms. Ashe's notes of the meeting, two staff mentioned that they felt they had PTSD from Mr. Ako-Annan and some staff started to cry or were visibly shaking during the discussion. DSMF ¶ 10; PRDSMF ¶ 10.[10]  All the clinical staff said that they live for Mr. Ako-

---

[8]     Mr. Ako-Annan admits this fact but interposes a qualified response that he "provided a detailed explanation to Ms. Ashe and Ms. Baillageron explaining why the extant issues were not solely his responsibility."  PRDSMF ¶ 6.  The Court rejects the qualification because it does not alter the factual assertions in DSMF ¶ 6.  The Court deems DSMF ¶ 6 admitted pursuant to Local Rule 56(f).

[9]     Mr. Ako-Annan does not deny this fact and therefore the Court deems is admitted pursuant to Local Rule 56.  Mr. Ako-Annan objects that Ms. Ashe's notes are hearsay "except for the limited purpose that these comments explain why Ms. Ashe met with Mr. Ako-Annan."  PRDSMF ¶ 9. The Court overrules the objection.  The statements are not hearsay because EMMC is not offering them for the truth of the matter asserted, "but rather as evidence of what [Ms.] Ashe knew and what EMMC was informed about [Mr. Ako-Annan's] performance."  DRPSAMF ¶ 9.

[10]     Mr. Ako-Annan does not deny this fact and the Court deems it admitted pursuant to Local Rule 56(f).  PRDSMF ¶ 10.  Mr. Ako-Annan objects that Ms. Ashe's notes are hearsay "except for the limited purpose that these comments explain why Ms. Ashe met with Mr. Ako-Annan."  PRDSMF ¶ 10. The Court overrules the objection.  The statements are not hearsay because EMMC is not offering

Annan's three-week vacation in August because they feel the office runs more smoothly and they can function as a team. DSMF ¶ 11; PRDSMF ¶ 11.[11]

After concluding their meeting with staff, Ms. Ashe and Ms. Baillageron met with Mr. Ako-Annan. DSMF ¶ 12; PRDSMF ¶ 12. Ms. Ashe and Ms. Baillageron told Mr. Ako-Annan that staff in the office said he yelled at them and made them feel they were not valued, that he reprimanded staff in front of others, and refused to deal with patient complaints, although Mr. Ako-Annan defended himself by saying that he was not the sole cause of these issues. DSMF ¶ 13; PRDSMF ¶ 13.[12]

On May 15, 2017, Ms. Ashe and Ms. Baillageron performed more interviews at the Orono Practice. DSMF ¶ 14; PRDSMF ¶ 14. Notes of those meetings reflect that staff told Ms. Ashe and Ms. Baillageron that: (1) "staff feel [Mr. Ako-Annan] does not support them and he is incapable of this because he does not understand their role," (2) staff "doesn't feel supported by [Mr. Ako-Annan]," (3) Mr. Ako-Annan "yells often," (4) Mr. Ako-Annan "will talk above [staff]," and (5) Mr. Ako-Annan "dodges responsibilities." DSMF ¶ 14; PRDSMF ¶ 14.[13]

---

them for the truth of the matter asserted, "but rather as evidence of what [Ms.] Ashe knew and what EMMC was informed about [Mr. Ako-Annan's] performance and staff morale." DRPSAMF ¶ 10. The Court does not admit the complaints for their truth or Ms. Ashe's notes for the truth that that the statements were actually made to her. The Court admits the statements for the limited purpose of showing what information Ms. Worster had notice of when she fired Mr. Ako-Annan.

[11] As with the objection to Defendant's Statement of Material Fact paragraph 10, Mr. Ako-Annan does not deny this fact and the Court deems it admitted pursuant to Local Rule 56(f). PRDSMF ¶ 11. Mr. Ako-Annan objects that Ms. Ashe's notes are hearsay "except for the limited purpose that these comments explain why Ms. Ashe met with Mr. Ako-Annan." PRDSMF ¶ 11. The Court overrules the objection on the same basis as set forth in the preceding paragraph.

[12] Mr. Ako Annan admits this statement of fact, but qualifies it, noting that he "contested his sole responsibility for the issues being raised." PRDSMF ¶ 13. Viewing the record in the light most favorable to Mr. Ako-Annan, the Court accepts his qualification and has amended Defendant's Statement of Material Fact thirteen accordingly.

[13] Mr. Ako-Annan does not deny this fact and the Court deems it admitted pursuant to Local Rule 56(f). PRDSMF ¶ 14. Mr. Ako-Annan objects that Ms. Ashe's notes are hearsay "except for the

On May 22, 2017, Ms. Ashe again met with Mr. Ako-Annan to discuss the results of her meetings with staff at the Orono Practice. DSMF ¶ 15; PRDSMF ¶ 15. Mr. Ako-Annan became angry and agitated. DSMF ¶ 16; PRDSMF ¶ 16.[14] He grew frustrated with Ms. Ashe, told her that she was holding him to a different standard than the other practice managers, and accused her of treating him in a racist manner. DSMF ¶¶ 17-18; PRDSMF ¶¶ 17-18; PSAMF ¶ 114; DRPSAMF ¶ 114. Mr. Ako-Annan said "I'm not some dumb black man." DSMF ¶ 19; PRDSMF ¶ 19. Ms. Ashe responded "I'm not saying that, David. I haven't said that, and I don't feel that." DSMF ¶ 20; PRDSMF ¶ 20. Ms. Ashe then said to Mr. Ako-Annan "my foster child is Black, so don't talk to me about discrimination." DSMF ¶ 21; PRDSMF ¶ 21. In response, Mr. Ako-Annan angrily told Ms. Ashe that her foster child was irrelevant, that he perceived Ms. Ashe's mention of her foster child as a racial comment, and that he would not tolerate Ms. Ashe's behavior. PSAMF ¶ 115; DRPSAMF ¶ 115.

During the May 22, 2017 meeting, Mr. Ako-Annan raised his voice at Ms. Ashe loud enough that three employees of the Orono Practice, S.N., M.G., and C.R.,

limited purpose that these comments explain why Ms. Ashe met with Mr. Ako-Annan." PRDSMF ¶ 14. The Court sustains the hearsay objection but includes the statements. The statements are not hearsay because EMMC is not offering them for the truth of the matter asserted, "but rather as evidence of what EMMC was informed about [Mr. Ako-Annan's] performance." DRPSAMF ¶ 14. The Court does not accept the statements for their truth or for the truth that the complaints were made to Ms. Ashe. However, the Court does accept the statement for purposes of notice to Ms. Worster, who reviewed Ms. Ashe's notes before firing Mr. Ako-Annan.

[14]     Mr. Ako-Annan qualifies this statement, admitting that he became angry and agitated but explaining that he told Ms. Ashe that he was not "some dumb Black man" and that he thought Ms. Ashe was racist. PRDSMF ¶ 16. Mr. Ako-Annan also says that it was at this point, Ms. Ashe responded by commenting that she had a Black foster child, to which Mr. Ako-Annan angrily responded that was irrelevant, that he perceived that as a racial comment, and that he would not tolerate that behavior. PRDSMF ¶ 16. As the Court is required to view the record in the light most favorable to Mr. Ako-Annan, the Court accepts Mr. Ako-Annan's qualifications, but places these comments in the ensuing paragraphs.

reported it.  DSMF ¶ 22; PRDSMF ¶ 22.  Ms. Ashe became upset and left the meeting

with tears in her eyes.  DSMF ¶ 23; PRDSMF ¶ 23.  Ms. Ashe then complained about

Mr. Ako-Annan's behavior at the meeting to her supervisor, Mr. Reid.  DSMF ¶ 24;

PRDSMF ¶ 24. After the meeting, Mr. Ako-Annan went to human resources where

he filed a complaint about Ms. Ashe's comments on the ground that they were racially

insensitive.  PSAMF ¶ 116; DRPSAMF ¶ 116.[15]

### G.   May 25, 2017 and June 2, 2017: Michael Reid Meets with David Ako-Annan and Donna Ashe; David Ako-Annan Receives an Oral Warning

On May 25, 2017, Mr. Reid met with Mr. Ako-Annan to discuss the May 22,

2017, meeting between Mr. Ako-Annan and Ms. Ashe. DSMF ¶ 25; PRDSMF ¶ 25.[16]

A memorandum summarizing the meeting states that Mr. Ako-Annan told Mr. Reid

that Ms. Ashe did not like Mr. Ako-Annan and that Mr. Ako-Annan "mentioned his

discussion regarding discrimination . . . because he was Black."  PSAMF ¶ 117;

DRPSAMF ¶ 117.  Mr. Reid discussed with Mr. Ako-Annan "the importance of

showing his [superior] respect [and] to always behave in a professional manner,"

---

[15]     EMMC interposes a qualified response to this statement, claiming that Mr. "Ako-Annan filed his complaint about his supervisor in response to the oral warning he received." DRPSAMF ¶ 116. Construing the record in the light most favorable to Mr. Ako-Annan, the Court rejects this qualification because Mr. Ako-Annan's statement of fact references page 87, lines 5 to 14 of his deposition testimony, in which Mr. Ako-Annan indicated that he spoke with a vice president of human resources named Harry who referred to him a human resources employee named Sean Ward. *Ako-Annan Dep.* at 86:23-87:4. Mr. Ako-Annan then met with Sean Ward later that same day for about four hours and "expressed [his] frustration to [Mr. Ward] and what happened in order to take care of it." *Id.* at 87:6-7. All this took place before the oral warning.
       As originally phrased by Mr. Ako-Annan, Plaintiff's additional statement of fact paragraph 116 presupposed that Ms. Ashe's statements were racially insensitive, which is a conclusion, not an asserted fact. The Court revised the paragraph to assert the fact, not the opinion.
[16]     Mr. Ako-Annan admits this fact but interposes a qualified response that Mr. Ako-Annan informed Mr. Reid at the May 25, 2017 meeting that he thought Ms. Ashe engaged in race discrimination. PRDSMF ¶ 25. The Court includes the substance of the qualification elsewhere in this Order.

which Mr. Ako-Annan understood to mean that he would have to resolve his differences with Ms. Ashe because she was going to remain his supervisor.  PSAMF ¶ 122; DRPSAMF ¶ 122.

Based on the statements made by multiple employees who overheard the interchange between Ms. Ashe and Mr. Ako-Annan and reported that Mr. Ako-Annan was yelling, Mr. Reid concluded that Mr. Ako-Annan should receive an oral warning for his behavior.  DSMF ¶ 26; PRDSMF ¶ 26.[17]  On June 2, 2017, EMMC gave Mr. Ako-Annan an oral warning for violating two EMMC rules: failure of good behavior and poor relations with patients, visitors, medical staff, and/or other employees.  *R.* ¶ 18; PSAMF ¶ 121; DRPSAMF ¶ 121.[18]

## H.   June 2017: David Ako-Annan Voices Concerns of Discrimination; EMMC Investigates

In June 2017, EMMC was aware that Mr. Ako-Annan was passionate and was upset about the racist comments he attributed to Ms. Ashe.   PSAMF ¶ 118; DRPSAMF ¶ 118.  During a June 2, 2017 meeting with Mr. Reid, Mr. Ako-Annan

---

[17]   Mr. Ako-Annan admits that Mr. Reid issued him an oral warning but argues that this statement should be stricken as hearsay, "except for the limited purpose that these comments explain why Mr. Reid issued an oral warning to Mr. Ako Annan for his behavior."  PRDSMF ¶ 26.  The Court overrules the objection because EMMC states that Mr. Reid's oral warning to Mr. Ako-Annan "is not being offered for the truth of that matter (i.e., that [Mr. Ako-Annan] actually yelled, but rather the information reported to [Mr.] Reid, [Mr.] Reid's conclusion, and the conduct and information that [Mr.] Reid relied on to issue the oral warning."  DRPSAMF ¶ 26.  The statements are not properly excludable as hearsay because EMMC has not offered them for their truth, but for notice of what information had been relayed to Mr. Reid.

[18]   PSAMF ¶ 121 states: "Notwithstanding his complaint, Mr. Ako-Annan was given a written counseling for being too loud during the meeting with his supervisor that was placed in his personnel file."  EMMC denies this statement, noting that Mr. "Ako-Annan submitted his formal complaint after he received an oral warning for violating two EMMC work rules: failure of good behavior and poor relations with patients, visitors, medical staff and/or other employees."  DRPSAMF ¶ 121 (citing *R.* ¶¶ 18-19).  The Court accepts EMMC's denial and declines to include Mr. Ako-Annan's statement of fact.  Because Mr. Ako-Annan submitted his formal complaint of race and sex discrimination after his oral warning, the oral warning cannot be said to have occurred "[n]otwithstanding his complaint."

voiced his view that he was being treated differently due to his race. PSAMF ¶ 120; DRPSAMF ¶ 120. In early June 2017, Mr. Ako-Annan submitted a written response to his oral warning to EMMC's human resource department. *R.* ¶ 19; PSAMF ¶ 119; DRPSAMF ¶ 119. Mr. Ako-Annan's written response to his oral warning alleged that Ms. Ashe discriminated against him based on his race, national origin, and gender. DSMF ¶ 27; PRDSMF ¶ 27; PSAMF ¶ 119; DRPSAMF ¶ 119.[19]

Sean Ward, a human resources manager for EMMC, investigated Mr. Ako-Annan's discrimination complaint, but other than Mr. Ako-Annan himself, Mr. Ward interviewed only female employees. DSMF ¶ 28; PRDSMF ¶ 28.[20] Other than interviewing Mr. Ako-Annan, Mr. Ward interviewed two female employees, Ms. Ashe and S.N. PSAMF ¶ 125; DRPSAMF ¶ 125.[21] Mr. Ward did not ask Ms. Ashe

---

[19]    The Court slightly modified this statement of fact in response to a qualified response by Mr. Ako-Annan denying "the implication that his complaint that Ms. Ashe discriminated against him based on race and national origin was a response to the oral warning" and noting that "Mr. Ako Annan had already made these complaints to H.R. on May 22, 2017 and May 25, 2017 before the oral warning was issued." PRDSMF ¶ 27. Notwithstanding Mr. Ako-Annan's objections to any perceived implications, EMMC's proffered statement of fact refers to a document that is literally titled "In Response To My Oral Warning" dated June 2, 2017, that Mr. Ako-Annan submitted to EMMC after receiving his oral warning. *See R.*, Attach. 8, *In Response to My Oral Warning*. Whether or not Mr. Ako-Annan intended the document to respond to the oral warning is not within the scope of EMMC's assertion. Even construing the record in the light most favorable to Mr. Ako-Annan, the document is a written response and the Court clarifies the factual statement accordingly. To the extent Mr. Ako-Annan seeks to assert additional facts that he notified EMMC of Ms. Ashe's racial discrimination at an earlier date, the Court denies the qualification as an improper assertion of additional facts under Local Rule 56(c).
[20]    Mr. Ako-Annan qualifies this fact by noting that Mr. Ward "interviewed only female employees." PRDSMF ¶ 28. The Court accepted this qualified response because it is required to view the record in the light most favorable to Mr. Ako-Annan.
[21]    PSAMF ¶ 125 reads: "During the May-June 2017 investigation conducted by Sean Ward of the Orono practice, he interviewed only female employees." EMMC denies this fact, noting that "Sean Ward interviewed Ako-Annan, who is a male." DRPSAMF ¶ 125. The Court declines to strike PSAMF ¶ 125 in response to DRPSAMF ¶ 125; however, a qualification is appropriate, and the Court amends PSAMF ¶ 125 accordingly. The record reflects that Mr. Ward interviewed three individuals during his investigation: (1) Mr. Ako-Annan, (2) Ms. Ashe, and (3) S.N., the clinical lead at the Orono Practice. DSMF, Attach. 4, *Decl. of Alison Worster* at 5 (*Worster Decl.*)

whether she was aware of any other instances of alleged discrimination at the Orono

Practice.  PSAMF ¶ 126; DRPSAMF ¶ 126.  Mr. Ward's report concluded:

> There is no finding of adverse action based on race or other protected
> status.  Ako-Annan's discipline was justified for his conduct [on May 22,
> 2017].  Ako-Annan's complaint as it pertains to Ashe's foster child or
> outgrowing his position were not directed at Ako-Annan's race or other
> protected status and did not result in any adverse employment action.

DSMF ¶ 29; PRDSMF ¶ 29.[22]

Mr. Ward further concluded "there is discord between the practice manager

and practice director, and within the practice."  DSMF ¶ 30; PRDSMF ¶ 30.  To

address the discord, Mr. Ward recommended a number of steps including setting

expectations related to respectful communication, an action plan for Mr. Ako-Annan,

and a requirement that Ms. Ashe clearly convey her expectations for him.  DSMF

¶ 31; PRDSMF ¶ 31.  Ms. Ashe was coached as to Mr. Ako-Annan's concerns about

racism but was not disciplined for her racially insensitive remarks to Mr. Ako-Annan.

PSAMF ¶ 123; DRPSAMF ¶ 123.  EMMC agrees that Ms. Ashe should have been

disciplined if she made racially based comments.  PSAMF ¶ 124; DRPSAMF ¶ 124.

On July 6, 2017, EMMC placed Mr. Ako-Annan on a Performance

Improvement Plan.  *R.* ¶ 20.  Mr. Ako-Annan successfully completed the Performance

Improvement Plan.  *R.* ¶ 21.  A performance improvement plan is not part of the

---

[22]     Mr. Ako-Annan admits the first sentence of DSMF ¶ 29 but "denies the second statement in
that the Director of EMMC Human Resources Department, Alison Worster, Esq., agrees that the
comment by Ms. Ashe to Mr. Ako Annan about her Black step-child was inappropriate."  PRDSMF
¶ 29.  The Court rejects this denial because EMMC's statement of fact refers to the contents of Mr.
Ward's report.  Mr. Ako-Annan's qualification contests the report's conclusions; however, he does not
deny that it contains the language EMMC quotes.  The Court deems the fact admitted under Local
Rule 56(f).

disciplinary hierarchy of tools but is instead used to address performance issues or when a leader is not effectively leading their group.  PSAMF ¶ 128; DRPSAMF ¶ 128.

On October 31, 2017, Alison Worster, EMMC's Vice President of Human Resources, checked in with Mr. Ako-Annan who reported that things were going well. DSMF ¶ 32; PRDSMF ¶ 32.  Mr. Ako-Annan actually believed that things were going well at that time.  DSMF ¶ 33, PRDSMF ¶ 33.

## I.    The Orono Practice Under Mr. Ako-Annan's Management

The parties' statements of fact detailed several issues facing the Orono Practice during Mr. Ako-Annan's tenure as practice manager.  There were constant changes and system issues at EMMC from 2015 to 2020.  PSAMF ¶ 138; DRPSAMF ¶ 138. There were many times when staff at the Orono Practice experienced difficulties when initiatives were rolled out.  PSAMF ¶ 139; DRPSAMF ¶ 139.  A failure to address systemic issues impacting the Orono Practice was a shared responsibility between Mr. Ako-Annan and Ms. Ashe.  PSAMF ¶ 137, DRPSAMF ¶ 137.

### 1.    Financial Performance

EMMC expects its practice managers to reach national productivity benchmarks.  PSAMF ¶ 156; DRPSAMF ¶ 156.  The Orono Practice's financial performance was satisfactory during Mr. Ako-Annan's tenure.  PSAMF ¶ 157; DRPSAMF ¶ 157; PSAMF ¶ 159; DRPSAMF ¶ 159.  Orono's adherence to financial objectives was a likely point of emphasis by Ms. Ashe in her discussions with Mr. Ako-Annan.  PSAMF ¶ 158; DRPSAMF ¶ 158.  Ms. Ashe did not meet EMMC's budgetary goals for her division in 2019.  PSAMF ¶ 160; DRPSAMF ¶ 160.

17

### 2.    Diversity

Only ten of the Orono Practice's eighty-four employees were male.  PSAMF ¶ 75; DRPSAMF ¶ 75.  Only four Orono Practice employees identified as people of color, and Mr. Ako-Annan was the only Black person employed there.  PSAMF ¶¶ 76-77; DRPSAMF ¶¶ 76-77.  EMMC has not performed an analysis of the gender or racial make-up of its primary care practices.  PSAMF ¶ 78; DRPSAMF ¶ 78.  Ms. Ashe did not regard the Orono Practice as a diverse workplace.  PSAMF ¶ 79; DRPSAMF ¶ 79.[23]  During Ms. Ashe's tenure as Director of Physician Services, there have been no efforts to improve diversity within the Orono Practice.  PSAMF ¶ 80; DRPSAMF ¶ 80.

### 3.    Difficulties with Software Rollouts

From 2018 to 2019, EMMC implemented a new electronic medical records system and a new fax scanning system.  PSAMF ¶ 140; DRPSAMF ¶ 140.  EMMC has acknowledged its staff had difficulty with the implementation of these new systems.  PSAMF ¶ 141; DRPSAMF ¶ 141.  XMedius, the new fax scanning system, was rolled out rather suddenly.  PSAMF ¶ 144; DRPSAMF ¶ 144.  EMMC has suggested that Mr. Ako-Annan could have sought additional training on XMedius.  PSAMF ¶ 142; DRPSAMF ¶ 142.  Ms. Ashe acknowledges that Mr. Ako-Annan asked for additional training for the two software systems and Mr. Ako-Annan prepared a "nice outline" for XMedius.  PSAMF ¶ 143; DRPSAMF ¶ 143.  According to EMMC,

---

[23]    EMMC interposes a qualified response that "The citation provided establishes only that [Ms.] Ashe did not regard it as a diverse workplace."  *See* DRPSAMF ¶ 79 (citing *Ashe Dep.* at 77:2-4).  The Court accepts the qualification.

if a practice manager asked Ms. Ashe for assistance in training staff on computer software or a program, it would not be appropriate for her to simply tell the practice manager that she would get back to them and fail to do so.  PSAMF ¶ 146; DRPSAMF ¶ 146.

### 4.    Morale Problems

In 2017, Mr. Ako-Annan raised concerns about his lack of authority and resources with Ms. Worster in human resources.  PSAMF ¶ 166; DRPSAMF ¶ 166. Part of a practice manager's job is to enforce EMMC's policies and procedures. PSAMF ¶ 167; DRPSAMF ¶ 167.  During his tenure, Mr. Ako-Annan often had to enforce policy issues with various staff members.  PSAMF ¶ 168; DRPSAMF ¶ 168. When given a choice of whether to implement a policy that might impact staff morale, managers were expected to implement the policy and explain to staff why the policy needed to be followed.  PSAMF ¶ 169; DRPSAMF ¶ 169.  A practice manager may experience pushback from employees who have been subjected to rules enforcement by the practice manager.  PSAMF ¶ 170; DRPSAMF ¶ 170.

On one occasion, Mr. Ako-Annan informed Ms. Ashe that he was having difficulty explaining to staff why certain policies needed to be implemented.  PSAMF ¶ 171; DRPSAMF ¶ 171.  Mr. Ako-Annan informed Ms. Ashe that staff were getting upset because he had to enforce organizational rules.  PSAMF ¶ 172; DRPSAMF ¶ 172.  Ms. Ashe was aware that staff were pushing back against Mr. Ako-Annan's request that staff call patients with appointment reminders, a measure designed to increase patient productivity.  PSAMF ¶ 212; DRPSAMF ¶ 212.

S.N. was the clinical lead for the Orono Practice during Mr. Ako-Annan's tenure. PSAMF ¶ 173; DRPSAMF ¶ 173. Mr. Ako-Annan informed Ms. Ashe that S.N. sometimes undermined him with the medical assistant staff, and that she did not support him with the medical assistant staff. PSAMF ¶ 174; DRPSAMF ¶ 174. Mr. Ako-Annan and S.N. occasionally raised their voices with one another. PSAMF ¶¶ 175; DRPSAMF ¶¶ 175. However, they respected each other and Mr. Ako-Annan valued S.N.'s opinions. PSAMF ¶ 176; DRPSAMF ¶ 176. S.N. would meet with Mr. Ako-Annan in his office fifteen to twenty times per day. PSAMF ¶ 177; DRPSAMF ¶ 177.

Absenteeism was impacting morale at the Orono Practice in late 2018 into 2019. PSAMF ¶ 151; DRPSAMF ¶ 151. During Mr. Ako-Annan's tenure as practice manager, morale was adversely affected within the Orono Practice because the staff were not working as a team and were working against one another. PSAMF ¶ 147; DRPSAMF ¶ 147. At some point between 2015 and 2019, EMMC upper management requested that its primary care practices reduce staff. PSAMF ¶ 148; DRPSAMF ¶ 148. Fewer people were being asked to do more and more work and possibly resulted in their being tired. PSAMF ¶ 149; DRPSAMF ¶ 149.[24] In 2019, EMMC's human resources department heard from a lot of places within EMMC that there was insufficient staffing, including at the Orono Practice. PSAMF ¶ 218; DRPSAMF

---

[24]    PSAMF ¶ 149 reads: "Chronic understaffing at the Orono practice was resulting in the staff feeling tired and overworked." *Id.* (citing *EMMC Dep.* at 186:13-24). EMMC denies this fact, writing "The citation provided states 'does fewer people being asked to do more and more work result in peopled being tired? Possibly, yes.'" DRPSAMF ¶ 149. The Court revised PSAMF ¶ 149 to correspond to the contents of the record citation.

¶ 218.[25]   EMMC acknowledges that staffing shortages may lead to morale issues because fewer people must perform the same amount of work.   PSAMF ¶ 152; DRPSAMF ¶ 152.  Mr. Ako-Annan tried to address the poor morale by meeting with individuals, meeting with the Orono Practice team, and making rules.  PSAMF ¶ 150; DRPSAMF ¶ 150.  The absenteeism of L.T. and others impacted the workload of employees in the Orono Practice, which was detrimental to morale.  PSAMF ¶ 153; DRPSAMF ¶ 153.  Mr. Ako-Annan attempted to address absenteeism by stressing the importance of working as a team and that absences hurt the team.  PSAMF ¶ 154; DRPSAMF ¶ 154.

In 2019, EMMC was making a number of organizational changes that required increased work by its employees.  PSAMF ¶ 211; DRPSAMF ¶ 211.  EMMC's primary care practice managers were under pressure to bring about these changes.  PSAMF ¶ 211; DRPSAMF ¶ 211.  Differences in staff support for medical providers led to morale issues at the Orono Practice.   PSAMF ¶ 161; DRPSAMF ¶ 161.  Mr. Ako-Annan regularly met with staff including Sonya Michaud and the clinical lead, S.N.  PSAMF ¶ 162; DRPSAMF ¶ 162.  Mr. Ako-Annan treated the clinical lead and others with whom he met with respect.  PSAMF ¶ 163; DRPSAMF ¶163.  Mr. Ako-Annan attended morning group huddles at the Orono Practice 98% of the time.   PSAMF

---

[25]      EMMC interposes a qualified response that "Ms. Worster testified that she hears concerns about insufficient staffing 'from a lot of places' and that it was not unique to Orono because 'we're a health care organization. Health care jobs are incredibly competitive' and the need is a nationwide problem for medical practices." DRPSAMF ¶ 218 (citing *EMMC Dep.* at 65:19-66:8).  The Court rejects the qualification and deems the fact admitted under Local Rule 56(f).  While it is true that EMMC's deposition testimony refers to a nationwide medical staffing shortage, the record read in the light most favorable to Mr. Ako-Annan could plausibly support the conclusion that EMMC was acknowledging it had staffing shortages at the Orono Practice and that those shortages were consistent with the national trend.

¶ 164; DRPSAMF ¶ 164.  On those occasions when Ms. Ashe attended one of Mr. Ako-Annan's staff meetings, Mr. Ako-Annan did a good job of running staff meetings and was informative.  PSAMF ¶ 165; DRPSAMF ¶ 165.

### 5.  2018: David Ako-Annan Grows Concerned About Absenteeism at the Orono Practice and Potential FMLA Fraud

Mr. Ako-Annan felt that Dr. R, a physician at the Orono Practice, did not want staff at the Orono Practice to be disciplined for absenteeism.  DSMF ¶ 34; PRDSMF ¶ 34.  He further believed Dr. R was doing everything possible to prevent staff from being disciplined for absences.  DSMF ¶ 34; PRDSMF ¶ 34.  In 2018, Mr. Ako-Annan voiced his concerns about Family Medical Leave Act (FMLA) fraud to Dr. R, who told Mr. Ako-Annan that if a patient comes to a provider and says they are sick and it is FMLA related, the provider would put it on paper.  DSMF ¶ 35; PRDSMF ¶ 35; PSAMF ¶ 184; DRPSAMF ¶ 184.

That same year, Mr. Ako-Annan told Ms. Ashe that he suspected that Dr. R was committing FMLA fraud.  DSMF ¶ 38; PRDSMF ¶ 38; PSAMF ¶¶ 178-79; DRPSAMF ¶¶ 178-79.[26]  Mr. Ako-Annan never reported his concerns to Dr. S, who oversees provider issues; however, EMMC's human resources department was aware of Mr. Ako-Annan's concerns about the fraudulent use of FMLA leave by staff.  DSMF

---

[26]     EMMC interposes a qualified response to PSAMF ¶ 178, urging that PSAMF ¶ 178 cites a portion of the record that indicates "Mr. Ako-Annan spoke to Ms. Ashe 'regarding his concern about possibly what [he] calls FMLA fraud' about one staff member."  The Court rejects EMMC's qualification and deems the fact admitted under Local Rule 56(f) because EMMC's proffered statement of fact, DSMF ¶ 38, is substantially the same as Mr. Ako-Annan's proffered statement, PSAMF ¶ 178.

¶ 38; PRDSMF ¶ 38.[27]  Mr. Ako-Annan considered this to be a conflict of interest and recommended to Ms. Ashe that his staff should not have a primary care provider in the Orono Practice.  DSMF ¶ 36; PRDSMF ¶ 36.  This was just Mr. Ako-Annan's recommendation, and he knew Ms. Ashe did not have authority to implement his suggestion without approval from other EMMC stakeholders.  DSMF ¶ 37; PRDSMF ¶ 37.

Mr. Ako-Annan was concerned that Dr. R was fraudulently granting FMLA leave to staff, particularly to Dr. R's assistant, M.G., so that staff would not be regarded as absent.  PSAMF ¶ 180; DRPSAMF ¶ 180.  Mr. Ako-Annan's concerns about M.G.'s use of FMLA were based on Facebook posts that other Orono Practice employees told him about.  DSMF ¶ 39; PRDSMF ¶ 39.  After Mr. Ako-Annan told Ms. Ashe about his FMLA fraud concerns and M.G., Ms. Ashe told him that she could not do anything about it because if an employee was having forms signed by her physician and human resources was approving FMLA leave, it was not for Ms. Ashe or Mr. Ako-Annan to question.  PSAMF ¶ 185; DRPSAMF ¶ 185.[28]

Mr. Ako-Annan was aware FMLA fraud presented a legal issue.  PSAMF ¶ 181; DRPSAMF ¶ 181.[29]  When S.N. raised concerns to Mr. Ako-Annan about staff taking

---

[27]    The Court accepts Mr. Ako-Annan's qualification of DSMF ¶ 38 and modified the proffered fact to note EMMC's human resources department was also aware of Mr. Ako-Annan's FMLA fraud concerns.

[28]    PSAMF ¶ 185 reads: "After Mr. Ako-Annan spoke to Ms. Ashe about his concern that FMLA leave was being used fraudulently, Ms. Ashe told him she could not do anything about it."  PSAMF ¶ 185.  EMMC interposes a qualification explaining what Ms. Ashe told Mr. Ako-Annan in support of his position.  DRPSAMF ¶ 185 (citing *Ashe Dep.* at 66:17-24).  The Court accepts EMMC's qualification.

[29]    EMMC denies PSAMF ¶ 181, stating that "The record cited does not support the assertion.  When S.N. raised concerns to Ako-Annan about staff taking FMLA leave, he told her FMLA (not FMLA fraud) is a legal issue and said 'I don't want to be involved in FMLA issue, other than they have FMLA approved by HR and they can take it as and when needed.'"  DRPSAMF ¶ 181 (quoting *Ako-Annan*

FMLA leave, he told her that FMLA is a legal issue and said "I don't want to be involved in FMLA issue, other than they have FMLA approved by HR and they can take it as and when needed." DSMF ¶ 40; PRDSMF ¶ 40. Ms. Ashe told Mr. Ako-Annan that there was nothing they could do about the suspected FMLA fraud. DSMF ¶ 41; PRDSMF ¶ 41. Ms. Worster in human resources was aware of Mr. Ako-Annan's concerns about the fraudulent use of FMLA by staff at the Orono Practice. PSAMF ¶ 182; DRPSAMF ¶ 182.[30] She was unable to provide a timeframe regarding her discussions with Mr. Ako-Annan about the use of FMLA at the Orono Practice and its impact on staff morale. PSAMF ¶ 183; DRPSAMF ¶ 183.

EMMC handles all matters concerning FMLA at its facilities through its central human resources department. DSMF ¶ 42; PRDSMF ¶ 42. If the human resources department approves FMLA leave, Mr. Ako-Annan accepts the determination and does not question the medical reasons behind the approval. DSMF ¶ 43; PRDSMF ¶ 43. Mr. Ako-Annan understood that if a physician approved FMLA leave, then he was required to accept that. DSMF ¶ 44; PRDSMF ¶ 44.

### 6. Staff at the Orono Practice Grow Concerned that Dr. R is Overprescribing Opioids

*Dep.* at 111:20-112:1). The Court rejects EMMC's denial and deems the fact admitted under Local Rule 56(f). Although the cited portion of the record indicates Mr. Ako-Annan knew that the FMLA, rather than FMLA fraud, presents a legal issue, the Court must construe the record in the light most favorable to Mr. Ako-Annan and draw all reasonable inferences in his favor. In the Court's view, a reasonable trier of fact could interpret Mr. Ako-Annan's statement, when read in context, as communicating that Mr. Ako-Annan understood that all issues concerning the potential applicability of the FMLA were legal issues.

[30]     EMMC interposes a qualification to PSAMF ¶ 182 but the qualification provides specific information consistent with PSAMF ¶ 182. *See* DRPSAMF ¶ 182. The Court deems PSAMF ¶ 182 admitted pursuant to Local Rule 56(f). To the extent that DRPSAMF ¶ 182 provides additional facts concerning EMMC's approach to FMLA leave, the Court declines to include those facts because they do not materially differ from Mr. Ako-Annan's assertion and the Court is required to view the record in the light most favorable to Mr. Ako-Annan.

In early 2018, Mr. Ako-Annan told Ms. Ashe about a rumor that Dr. R was terminated from his former place of employment for prescribing opioids to patients outside the practice. DSMF ¶ 45; PRDSMF ¶ 45.[31] Mr. Ako-Annan reported to Ms. Ashe what Dr. R's former medical assistant told him. DSMF ¶ 46; PRDSMF ¶ 46. Mr. Ako-Annan received specific concerns from multiple staff members and had heard rumors among the staff that Dr. R had been terminated from a prior employer for prescribing opioids to patients outside his practice, that some of Dr. R's patients had died from overdoses, and that EMMC had hired Dr. R without doing an investigation. PSAMF ¶ 189; DRPSAMF ¶ 189.[32] S.N. informed Mr. Ako-Annan that some individuals seeking drugs from Dr. R were driving long distances to see him. PSAMF

---

[31] PSAMF ¶ 186 asserts "Mr. Ako-Annan informed Ms. Ashe in early 2018 that he thought Dr. R. was over-prescribing opioids." PSAMF ¶ 186 (citing *Ako-Annan Dep.* at 119:2-22, 187:17-23). EMMC denies the assertion and states Mr. "Ako-Annan had no personal knowledge of Dr. R's prescribing practices. He told Ms. Ashe that he had heard rumors and staff had concerns." DRPSAMF ¶ 186 (citing *Ako-Annan Dep.* at 118:24-119:24, 122:2-10). The Court declines to include PSAMF ¶ 186 for several reasons. First, although EMMC's denial is more properly construed as a qualification, it is accurate. Mr. Ako-Annan's deposition refers to a "rumor" that Dr. R was fired from his prior job because he was overprescribing opioids, not Mr. Ako-Annan's belief that Dr. R was actively overprescribing opioids in 2018. *Ako-Annan Dep.* at 118:24-119:24. Mr. Ako-Annan also stated that he had no personal knowledge that Dr. R was overprescribing opioids. *Id.* at 122:2-10. The second reason for rejecting PSAMF ¶ 186 is that Mr. Ako-Annan admitted in PRDSMF ¶ 47 that he had no personal knowledge Dr. R was overprescribing opioids. PRDSMF ¶ 47.

[32] EMMC interposes a qualified response that Mr. Ako-Annan's cited records do not support the assertions in these statements. DRPSAMF ¶ 189. It admits that Mr. Ako-Annan heard these rumors but denies their truth. The Court rejects the qualification and deems the fact admitted under Local Rule 56(f) because Mr. Ako-Annan's factual statement refers to the rumors Mr. Ako-Annan was told, not the truth of the allegations. At the same time, EMMC cites Ms. Ashe's deposition testimony for the proposition that Dr. R went through EMMC's credentialing process. DRPSAMF ¶ 189 (citing *Ashe Dep.* at 67:20-68:15). The Court rejects this qualification as unsupported by the record. Ms. Ashe's deposition testimony does not provide sufficient evidence of what credentialing process, if any, occurred, only that Ms. Ashe was not involved in any credentialing process. *Ashe Dep.* at 67:20-68:15.

¶ 190; DRPSAMF ¶ 190.[33]  Mr. Ako-Annan had no personal knowledge that Dr. R was overprescribing opioids.  DSMF ¶ 47; PRDSMF ¶ 47.

Ms. Ashe does not recall that Mr. Ako-Annan ever voiced concerns to her that Dr. R was overprescribing opioids.  PSAMF ¶ 187; DRPSAMF ¶ 187.[34]  However, Ms. Ashe was aware that after Dr. R joined the Orono Practice, Dr. R's former colleague filed a formal complaint against him with the Board of Licensure.  PSAMF ¶ 188; DRPSAMF ¶ 188.  EMMC monitors opioid prescriptions by its providers and flags any irregularities.  DSMF ¶ 48; PRDSMF ¶ 48.  EMMC has no record that Dr. R has ever been flagged.  DSMF ¶ 49; PRDSMF ¶ 49.

In response to a request by Mr. Ako-Annan, S.N. prepared an analysis of Dr. R's patients to assess which patients were receiving opioids.  PSAMF ¶ 191; DRPSAMF ¶ 191.  Mr. Ako-Annan informed Ms. Ashe that a medical assistant had informed him that one of Dr. R's patients was coming from a neighborhood where drug sales occurred, that the patient was doing drugs, and suggested they do a urine test on the patient.  PSAMF ¶ 192; DRPSAMF ¶ 192.  Mr. Ako-Annan knew Dr. R was facing various issues before the Board of Medicine.  PSAMF ¶ 193; DRPSAMF ¶ 193.  Mr. Ako-Annan spoke with Ms. Ashe twice about his concerns with Dr. R.

---

[33]     EMMC qualifies that nothing in the record indicates S.N. had personal knowledge as to why patients were driving long distances for appointments with Dr. R or whether there was anything improper about their prescriptions.  DRPSAMF ¶ 190.  The Court rejects this qualification as argument about the weight that should be given to this evidence rather than a qualification as to what Mr. Ako-Annan was told and the Court is required to view the record in the light most favorable to Mr. Ako-Annan.

[34]     PSAMF ¶ 187 asserts that "Ms. Ashe denies that Mr. Ako-Annan ever informed her that he had concerns about the prescribing of opioids by Dr. R."  *Id.* (citing *Ashe Dep.* at 69:10-70:6).  EMMC interposes a qualified response that "Ms. Ashe does not recall [Mr.] Ako-Annan ever bringing that issue to her attention."  DRPSAMF ¶ 187 (citing *Ashe Dep.* at 69:20-70:1).  The Court accepts EMMC's qualification.

PSAMF ¶ 194; DRPSAMF ¶ 194.  Mr. Ako-Annan spoke with Dr. S once about the same concerns.  PSAMF ¶ 195; DRPSAMF ¶ 195.

When Mr. Ako-Annan raised his concerns about Dr. R with Ms. Ashe, she told him the providers were powerful and untouchable, but that Mr. Ako-Annan should bring his concerns to Dr. S.  PSAMF ¶ 196; DRPSAMF ¶ 196.[35] After Mr. Ako-Annan spoke with Ms. Ashe and Dr. S about Dr. R, Mr. Ako-Annan spoke directly with Dr. R about the concerns with his prescribing practices.  PSAMF ¶ 197; DRPSAMF ¶ 197. During his discussion with Dr. R, Mr. Ako-Annan began to feel like Ms. Ashe "left [Mr. Ako-Annan] out to pasture."  PSAMF ¶ 198; DRPSAMF ¶ 198.[36]

### J.    2018: David Ako-Annan's Involvement in the L.R. Litigation[37]

L.R.'s counsel identified Mr. Ako-Annan as a potential witness in her case against EMMC that she filed in September 2016.  PSAMF ¶ 202; DRPSAMF ¶ 202. In 2018, EMMC's legal staff and outside counsel contacted Mr. Ako-Annan to discuss

---

[35]    EMMC interposes a qualified response to PSAMF ¶ 196, noting that Ms. Ashe told Mr. Ako-Annan to speak with Dr. S.  DRPSAMF ¶ 196 (citing *Ashe Dep.* at 180:2-13).  Although EMMC cites Ms. Ashe's deposition, the qualifying information is from Mr. Ako-Annan's deposition on the pages he cited in support of the factual assertion.  *Ako-Annan Dep.* at 180:6-7 ("And I think [Ms. Ashe] did tell me to talk to Dr. S, too, about it").  The Court accepts EMMC's qualification.

[36]    The Court strikes the phrasing of PSAMF ¶ 198 which asserted that "[d]uring his discussion with Dr. R., it became evident to Mr. Ako-Annan that Ms. Ashe had already informed Dr. R. that Mr. Ako-Annan had reported Dr. R. to Ms. Ashe which placed him in a difficult position with Dr. R." PSAMF ¶ 198 (citing *Ako-Annan Dep.* at 186:17-187:2).  EMMC interposes a qualified response that Mr. Ako-Annan's deposition testimony "does not support the assertion that Ashe had already informed Dr. R. that [Mr. Ako-Annan] had already reported Dr. R. to Ms. Ashe."  DRPSAMF ¶ 198.  Instead, EMMC says "[t]he record citation reflects that [Mr.] Ako-Annan testified that he felt like Ashe 'left [him] out to pasture'").  DRPSAMF ¶ 198.  The Court accepts EMMC's qualification.  Even when construing Mr. Ako-Annan's deposition testimony in the light most favorable to him and drawing all reasonable inferences in his favor, the cited portion of the deposition testimony does not establish that Ms. Ashe told Dr. R of Mr. Ako-Annan's concerns about him before Mr. Ako-Annan himself raised those concerns to Dr. R.  At most, the cited portion of the deposition establishes only that Mr. Ako-Annan believed that Ms. Ashe had informed Dr. R of Mr. Ako-Annan's concerns.

[37]    The parties' statements of facts do not explain whether L.R. was an employee of the Orono Practice and, if so, what her role was in the practice.  From context, the Court surmises she was an EMMC employee in some capacity.

what he knew about a retaliation complaint filed by L.R. that was an outgrowth of the discrimination Mr. Ako-Annan experienced in 2013. PSAMF ¶ 203; DRPSAMF ¶ 203. During the meeting, Mr. Ako-Annan informed EMMC's attorneys about how badly he had been treated by his co-worker and that the human resources department did absolutely nothing about his complaints. PSAMF ¶ 205; DRPSAMF ¶ 205.[38] Mr. Ako-Annan was upset that the human resources department never did anything to address his discrimination concerns that arose in 2013 and informed the EMMC attorneys how he felt. PSAMF ¶ 206; DRPSAMF ¶ 206.[39] After Mr. Ako-Annan informed EMMC's attorneys that L.R.'s attorney asked him to provide an affidavit, the attorneys told Mr. Ako-Annan not to sign the affidavit or have any further contact with L.R.'s attorney. PSAMF ¶ 204; DRPSAMF ¶ 204.[40]

Mr. Ako-Annan told Ms. Ashe that he was meeting with the EMMC legal department. PSAMF ¶ 207; DRPSAMF ¶ 207. On a second occasion, Mr. Ako-Annan explained to Ms. Ashe why he was meeting with EMMC's legal department because he suspected Ms. Ashe thought he had reported her. PSAMF ¶ 208; DRPSAMF ¶ 208. Mr. Ako-Annan did this because he wanted Ms. Ashe to know that his meeting with

---

[38]     EMMC interposes a qualified response that Mr. "Ako-Annan testified that he "narrated what happened." DRPSAMF ¶ 205. The Court rejects the qualification because EMMC's qualification is not supported by a corresponding record citation. The Court deems the fact admitted pursuant to Local Rule 56(f).

[39]     EMMC interposes a qualified response that Mr. Ako-Annan was "a bit upset." DRPSAMF ¶ 206 (citing *Ako-Annan Dep.* at 125:6). This qualification is substantively the same as Mr. Ako-Annan's asserted fact. Construing the record in the light most favorable to Mr. Ako-Annan, the Court rejects the qualification and deems the fact admitted under Local Rule 56(f).

[40]     EMMC interposes a qualified response that Mr. Ako-Annan "thinks" the EMMC attorneys told him not to sign the affidavit or have any further contact with L.R.'s attorney. DRPSAMF ¶ 204. The Court rejects the qualification and deems PSAMF ¶ 204 admitted under Local Rule 56(f) because the qualification is substantially the same as Mr. Ako-Annan's proffered statement of fact.

the legal department had nothing to do with their relationship but was instead "something to do with somebody who felt [Mr. Ako-Annan] was treated badly and [that person] stuck up for [Mr. Ako-Annan]." PSAMF ¶ 208; DRPSAMF ¶ 208.[41] According to Mr. Ako-Annan, Ms. Ashe was not at all upset with him after he provided this explanation. PSAMF ¶ 209; DRPSAMF ¶ 209. At the same time, Ms. Ashe responded by scrutinizing Mr. Ako Annan with many questions as she felt Mr. Ako Annan was making a complaint about her to the system attorneys. PSAMF ¶ 209; DRPSAMF ¶ 209.[42] Mr. Ako-Annan informed Ms. Worster in either 2017 or 2019 that he had been involved in the L.R. litigation. PSAMF ¶ 210; DRPSAMF ¶ 210.

### K.   Early March 2019: Staff at the Orono Practice Raise New Complaints About David Ako-Annan

On March 1, 2019, Dr. T, a physician at the Orono Practice, reported concerns about the practice to Ms. Ashe. DSMF ¶ 50; PRDSMF ¶ 50.[43] Dr. T labeled the Orono

---

[41]     The Court accepts DRPSAMF ¶ 208 as a qualified response to PSAMF ¶ 208.

[42]     Over EMMC's objection, the Court accepts Mr. Ako-Annan's statement of fact that "Ms. Ashe responded by scrutinizing Mr. Ako Annan with many questions as she felt Mr. Ako Annan was making a complaint about her to the system attorneys." PSAMF ¶ 209 M (citing *Ako-Annan Dep.* at 129:2-13; PSAMF, Attach. 3, *Pl.'s Second Suppl. Answers to Def. Eastern Maine Medical Center's First Set of Interrogs.* (*Pl.'s Second Suppl. Interrog. Resp.*)). EMMC denies this fact as unsupported by the record and asserts Mr. "Ako-Annan testified that when he told [Ms.] Ashe about his meeting with EMHS legal, she did not appear upset in any way, 'not at all.'" DRPSAMF ¶ 209 (quoting *Ako-Annan Dep.* at 129:6-18).

          EMMC's denial correctly reflects Mr. Ako-Annan's deposition testimony; however, it does not address Mr. Ako-Annan's reliance on his interrogatory responses. The Court reviewed the interrogatory responses and concludes they generally support the assertion in PSAMF ¶ 209. The relevant interrogatory response reads: "Anytime I let my Supervisor, Donna Ashe, know that I was attending a meeting with the system attorneys, she scrutinized me with many questions as she felt I was making a complaint or something of that sort about her to the system attorneys." *Pl.'s Second Suppl. Interrog. Resp.* at 4.

[43]     Mr. Ako-Annan objects that this statement is hearsay "except for the limited purpose that these comments explain, in part, why Ms. Ashe investigated Mr. Ako-Annan" but otherwise admits EMMC's factual assertion. PRDSMF ¶ 50. The Court overrules the objection and includes the statement. As EMMC correctly concludes, the statements come from Ms. Ashe's notes and "are not

Practice a "sinking ship" and said staff were leaving due to the work environment, a lack of trust in the practice manager, and a belief that Mr. Ako-Annan "will work to get rid of people." DSMF ¶ 51; PRDSMF ¶ 51.[44]

On March 6, 2019, Ms. Ashe met with three Orono Practice employees, Dr. F, K.D., and J.B., who all raised concerns about Mr. Ako-Annan. DSMF ¶ 52; PRDSMF ¶ 52. Dr. F reported that Mr. Ako-Annan is not empathetic to the needs of the employees, does not like to handle patient complaints, is not always honest, and is not respected as a leader. DSMF ¶ 52; PRDSMF ¶ 52.[45] J.B. told Ms. Ashe that there was a negative atmosphere at the Orono Practice, that she did not feel supported, that a patient had overheard Mr. Ako-Annan yelling at staff that morning, and that she could not ask Mr. Ako-Annan questions or he would get upset. DSMF ¶ 53; PRDSMF ¶ 53.[46]

---

hearsay because they are not being offered to demonstrate the truth of the concerns reported, but to show that [Ms.] Ashe met with Dr. T. and what information was known to EMMC about Plaintiff's performance and concerns regarding the management of the Orono practice." DRPSAMF ¶ 50. The Court does not exclude the statements as hearsay because EMMC does not offer them for the truth of the matter asserted. FED. R. EVID. 801.

[44]   Mr. Ako-Annan admits this statement but objects that it should be stricken as hearsay "except for the limited purpose that these comments explain, in part, why Ms. Ashe investigated Mr. Ako-Annan." PRDSMF ¶ 51. EMMC argues the statements are "not hearsay because they are not being offered to demonstrate the truth of the matter (i.e., that Orono actually was a sinking ship, etc.), but to show what information was reported to EMMC about [Mr. Ako-Annan's] performance and the morale of the office." DRPSAMF ¶ 51. The Court admits the statements as evidence of what EMMC was told about Mr. Ako-Annan's job performance but does not accept the statements for their truth.

[45]   The Court overrules Mr. Ako-Annan's request to strike this statement as hearsay, "except for the limited purpose that these comments explain, in part, why Ms. Ashe investigated Mr. Ako-Annan." PRDSMF ¶ 52. The Court overrules the objection because the statements come from Ms. Ashe's notes and "are not hearsay because they are not being offered to demonstrate the truth of the concerns reported, but to show what information was reported to EMMC about [Mr. Ako-Annan's] performance and the morale of the office." DRPSAMF ¶ 52. The Court admits the statements as evidence of what EMMC was told about Mr. Ako-Annan's job performance, not for their truth.

[46]   The Court overrules Mr. Ako-Annan's request to strike this statement as hearsay, "except for the limited purpose that these comments explain, in part, why Ms. Ashe investigated Mr. Ako Annan." PRDSMF ¶ 53. EMMC counters that the statements are not offered to demonstrate the truth of the concerns reported, but "to show what information was reported to EMMC about Plaintiff's

On March 8, 2019, Ms. Ashe met with another physician in the Orono Practice, Dr. R2, who conveyed that Orono Practice staff had expressed concern about Mr. Ako-Annan's management.  DSMF ¶ 54; PRDSMF ¶ 54.[47]  Dr. R2 told Ms. Ashe that he felt Mr. Ako-Annan was being a good soldier and that the real problems at the Orono Practice were due to mismanagement by the upper levels at EMMC Management. PRDSMF ¶ 54; PSAMF ¶ 238; DRPSAMF ¶ 238.

## L.    March 12, 2019: The Incident with M.G.[48]

During a March 12, 2019, staff meeting, Mr. Ako-Annan wanted to focus on positivity because staff at the Orono Practice had been overwhelmed.  PSAMF ¶ 214; DRPSAMF ¶ 214.[49]  Two staff members planned to be negative during the meeting. PSAMF ¶ 215; DRPSAMF ¶ 215.  During Mr. Ako-Annan's discussion of overtime, the two staff members began to express the negative concerns that they orchestrated. PSAMF ¶ 216; DRPSAMF ¶ 216.  In response to questions from the two staff

---

performance and the morale of the office."  DRPSAMF ¶ 53.  The Court admits the statements as evidence of what EMMC was told about Mr. Ako-Annan's job performance, not for their truth.

[47]    The Court modified this factual assertion in response to a denial by Mr. Ako Annan.  *See* PRDSMF ¶ 54.  Citing EMMC's deposition, Mr. Ako-Annan states that "Dr. R2, a longtime provider in the Orono practice, informed Ms. Ashe during her investigation, that Mr. Ako Annan was being a good solider and that the real problems in the practice were due to mismanagement by upper levels of EMMC Management."  PRDSMF ¶ 54 (citing *EMMC Dep.* at 199:17-200:12).  After reviewing Ms. Ashe's notes of her March 8, 2019 meeting with Dr. R2, the Court concludes that the evidence read in the light most favorable to Mr. Ako-Annan is that Dr. R2 was relaying the concerns of staff at the Orono Practice to Ms. Ashe at the March 8, 2019 meeting but did not necessarily share those concerns. PRDSMF, Attach. 5, *Notes of Donna Ashe from Meeting With Dr. R2 on March 8, 2019* at 1-2 (*Pl.'s Ex. 56*).  The Court accepts Mr. Ako-Annan's denial and inserted facts consistent with his assertions.

[48]    The parties' statements of material facts have conflicting assertions and admissions as to whether this meeting occurred on March 12, 2019 or March 13, 2019.  DSMF ¶ 55 asserts the meeting occurred on March 12, 2019, which Mr. Ako-Annan admitted in PRDSMF ¶ 55.  However, in PSAMF ¶ 214, Mr. Ako-Annan asserted that the meeting occurred on March 13, 2019, which EMMC admitted in DRPSAMF ¶ 214.  As the meeting's date is not material to Mr. Ako-Annan's claims, the Court refers to this meeting as the March 12, 2019 meeting.  In passing, the Court observes that Ms. Ashe's notes about this meeting strongly suggest the meeting occurred on March 12, 2019.  *See* DSMF, Attach. 2, *Decl. of Donna Ashe* at 11-12 (notes dated March 12, 2019).

[49]    The Court modified PSAMF ¶ 214 for the reasons explained in footnote 48.

members about why the Orono Practice was behind on its work, Mr. Ako-Annan indicated there had been many changes at the practice and that if staff did not show up, they could expect to fall behind. PSAMF ¶ 217; DRPSAMF ¶ 217.

S.N., the clinical lead, had already informed all the medical assistants that it was the process that was causing everything to get behind. PSAMF ¶ 219; DRPSAMF ¶ 219. According to a senior clerical staff member, the backlog at the Orono Practice was extensive and staff at the Orono Practice were working seven days a week with little reduction in the backlog. PSAMF ¶ 220; DRPSAMF ¶ 220.

M.G., a medical assistant at the Orono Practice, left the March 12, 2019 meeting upset and in tears after Mr. Ako-Annan called her out in front of the group for taking FMLA-approved leave. DSMF ¶ 55; PSAMF ¶ 221; DRPSAMF ¶ 221.[50] M.G. felt like she had been singled out. PSAMF ¶ 221; DRPSAMF ¶ 221. Mr. Ako-Annan then checked with S.N. to see where M.G. had gone. PSAMF ¶ 222; DRPSAMF ¶ 222. A staff member sent an email to Ms. Ashe that M.G. was upset and had gone home. PSAMF ¶ 223; DRPSAMF ¶ 223.

That same day, C.R., a medical assistant at the Orono Practice, contacted Ms. Ashe to voice concerns about the Orono Practice. DSMF ¶ 56; PRDSMF ¶ 56. C.R. told Ms. Ashe that Mr. Ako-Annan was yelling at staff and that five staff members were leaving because of how Mr. Ako-Annan treated staff. DSMF ¶ 57; PRDSMF

---

[50]     Mr. Ako-Annan qualifies this statement, noting that the situation "was an orchestrated effort by MG and a coworker to be negative and raise concerns." PRDSMF ¶ 55. The Court declines to include the qualification here because the qualification is substantially the same as PSAMF ¶¶ 215-16, which the Court includes elsewhere.

¶ 57.[51]  Another medical assistant, E.B., who had given her notice, reported to Ms. Ashe that she had problems with Mr. Ako-Annan, that he did not relate well to staff, and that she felt like she could not ask him questions.  DSMF ¶ 58; PRDSMF ¶ 58.[52]

Ms. Ashe conducted staff rounds at the Orono Practice on the day after Mr. Ako-Annan's incident with M.G.  PSAMF ¶ 224; DRPSAMF ¶ 224.  Ms. Ashe claims that she conducted the rounds at the request of Mr. Ako-Annan; however, Mr. Ako-Annan did not make such a request and never asked Ms. Ashe to perform rounds at the Orono Practice.  PSAMF ¶¶ 225-26; DRPSAMF ¶¶ 225-26.  Ms. Ashe checked in with S.N.  before speaking with Mr. Ako-Annan about what had happened with M.G. PSAMF ¶ 227; DRPSAMF ¶ 227.  Mr. Ako-Annan explained his perspective of the meeting to Ms. Ashe.  PSAMF ¶ 228; DRPSAMF ¶ 228.  Mr. Ako-Annan was unaware that this meeting was part of Ms. Ashe's investigation into his conduct. PSAMF ¶ 236; DRPSAMF ¶ 236.

## M.    March 2019: EMMC Investigates Mr. Ako-Annan for a Second Time

---

[51]    Mr. Ako-Annan admits this statement but says that it "should be stricken" as hearsay "except for the limited purpose that these comments explain, in part, why Ms. Ashe investigated Mr. Ako-Annan."  PRDSMF ¶ 57.  The Court overrules the objection.  EMMC explains that Ms. Ashe's notes "are not hearsay because they are not offered to demonstrate the truth of the concerns reported, but to show what information was reported to EMMC about Plaintiff's behavior and the morale of the office."  DRPSAMF ¶ 57.  On summary judgment, the Court admits the statements for notice, not their truth.

[52]    Mr. Ako-Annan admits this statement but says that it "should be stricken" as hearsay "except for the limited purpose that these comments explain, in part, why Ms. Ashe investigated Mr. Ako-Annan."  PRDSMF ¶ 58.  EMMC explains that Ms. Ashe's notes "are not hearsay because they are not being offered to demonstrate the truth of the problems reported, but to show what information was reported to EMMC about Plaintiff's performance and why E.B. was leaving."  DRPSAMF ¶ 58.  The Court overrules the objection.  On summary judgment, the Court admits the statements as evidence EMMC was on notice of complaints about Mr. Ako-Annan,  not their truth.

In response to the number and seriousness of the complaints that EMMC was receiving about Mr. Ako-Annan's management of personnel at the Orono Practice, Alison Worster, EMMC's Vice President of Human Resources, directed David Zelz, Human Resources Business Partner, to assist Ms. Ashe with an investigation of the situation.  DSMF ¶ 59; PRDSMF ¶ 59; PSAMF ¶ 229; DRPSAMF ¶ 229.  Mr. Ako-Annan was unaware of this investigation.  PSAMF ¶ 237; DRPSAMF ¶ 237.

On March 14, 2019, Ms. Ashe and Mr. Zelz met with providers at the Orono Practice.  DSMF ¶ 60; PRDSMF ¶ 60.  Ms. Worster later reviewed notes from the March 14, 2019, meeting, which stated that the providers expressed concerns about Mr. Ako-Annan's management of the office, including his lack of support and leadership, and his failure to understand what the staff does.  DSMF ¶ 61; PRDSMF ¶ 61.[53]  According to the notes, all the providers told Mr. Zelz that Mr. Ako-Annan had not addressed the low morale of the office or the loss of staff and that the issue is Mr. Ako-Annan. DSMF ¶ 62; PRDSMF ¶ 62.[54]  In a memorandum dated March 29,

---

[53]     Mr. Ako-Annan says "[t]his statement should be stricken" due to "[l]ack of personal knowledge and hearsay in that this statement contains an unidentifiable synthesis of information from different people."  PRDSMF ¶ 61.  The Court overrules both objections.  As for lack of personal knowledge, the Court recognizes that the description of the March 14, 2019 meeting comes from notes taken at the meeting and Ms. Worster was not present.  Thus, Ms. Worster lacks personal knowledge of what occurred at the meeting.  However, Ms. Worster received an oral report from Mr. Zelz and reviewed these notes before meeting with Mr. Ako-Annan on April 2, 2019. *Worster Decl.* ¶ 13.  Ms. Worster has personal knowledge of what Ms. Ashe and Mr. Zelz told her about Mr. Ako-Annan and the complaints against him.  Therefore, the Court accepts DSMF ¶ 61 with the qualification that it reflects what Ms. Worster was told about the meeting, rather than what actually happened.  The Court also overrules Mr. Ako-Annan's hearsay objection.  According to EMMC, the notes are "not being offered for the truth of the matter asserted (i.e., that [Mr.] Ako-Annan had not addressed the low morale, etc.), but rather what information was known to EMMC about [Mr. Ako-Annan's] performance."  DRPSAMF ¶ 61.  The Court admits the statements not for their truth but as evidence of the information known to Ms. Worster when she fired Mr. Ako-Annan.

[54]     Mr. Ako-Annan says that this statement "should be stricken" for lack of personal knowledge and hearsay.  PRDSMF ¶ 62.  He also "denies that there was complete uniformity among the physicians in that one of the two male physicians in the practice had informed Ms. Ashe that Mr. Ako Annan was being a good [soldier] and that the real problems in the practice were due to

2019, Ms. Ashe describes a phone call she received from Dr. R in which Dr. R expressed his disappointment that it appeared Mr. Ako-Annan would remain the practice manager after the providers' meeting.  PSAMF ¶ 199; DRPSAMF ¶ 199.

During the 2019 investigation, Ms. Ashe did not speak with Sonya Michaud, a long-time EMMC employee who held a variety of administrative positions.  PSAMF ¶ 230; DRPSAMF ¶ 230.  Mr. Ako-Annan treated Ms. Michaud fairly and they have mutual respect for one another.  PSAMF ¶ 231; DRPSAMF ¶ 231.  Ms. Michaud perceived that Ms. Ashe was unprofessional because she was condescending and showed favoritism to some employees at the Orono Practice, including L.T.  PSAMF ¶ 232; DRPSAMF ¶ 232.

According to Ms. Michaud, Ms. Ashe met frequently with L.T. in the Orono Practice's conference room.  PSAMF ¶ 233; DRPSAMF ¶ 233.  Ms. Ashe denies that she was a friend of L.T. or asked L.T. to keep an eye on the Orono Practice.  PSAMF ¶ 234; DRPSAMF ¶ 234.  Based on discussions with L.T., Ms. Michaud was aware

---

mismanagement by upper levels of EMMC management."  PRDSMF ¶ 62 (citing *EMMC Dep.* at 199:17-200:12).  The Court overrules Mr. Ako-Annan's requests to strike for hearsay for the same reasons explained in footnote 53 and has qualified the statement such that its reach is limited to Ms. Worster's personal knowledge.

The Court rejects Mr. Ako-Annan's denial and deems the fact admitted under Local Rule 56(f). The relevant fact is that the notes from the March 14, 2019 meeting indicated that Dr. R2 said "he is also concerned about the staff – they are looking for more direction from their manager" and "there is no leadership in the [Orono Practice]."  *Worster Decl.* at 8.  The meeting notes also said that Dr. R2 "did say that there are many messages that [Mr. Ako-Annan] had to deliver from 'above' and we needed to be careful that we were shooting the messenger."  *Id.*  Moreover, the meeting notes stated that Dr. R2 "said office meetings are always geared around numbers.  Not around issues and David cannot lead the meeting in a way to get to the other discussions."  *Id.*  Thus, the Court rejects Mr. Ako-Annan's denial because the March 14, 2019 meeting notes reflect that EMMC was told Dr. R2 was critical of Mr. Ako-Annan's management of the Orono Practice, notwithstanding Dr. R2's March 8, 2019 comments to Ms. Ashe that Mr. Ako-Annan was a "good soldier" and that upper-level management was responsible for problems at the Orono Practice.  Furthermore, the Court has already included Dr. R2's more positive comments in its recitation of the facts.

that L.T. was keeping an eye on the Orono Practice and compiled a written log of issues at the Orono Practice.[55]   PSAMF ¶ 235; DRPSAMF ¶ 235.   In 2018, Ms. Michaud warned Mr. Ako-Annan to watch his back because L.T. was keeping a log on him.  PSAMF ¶ 213; DRPSAMF ¶ 213.

After receiving an oral report from Mr. Zelz and reviewing Mr. Ako-Annan's personnel file, including the notes from the meetings with the Orono staff and providers, Ms. Worster had significant doubts about Mr. Ako-Annan's ability to effectively lead the Orono Practice and therefore scheduled a meeting with Mr. Ako-Annan and Ms. Ashe.  DSMF ¶ 63; PRDSMF ¶ 63.[56]  Ms. Worster was aware that Dr. R had expressed he was disappointed that it appeared that Mr. Ako-Annan was going to remain in his position as practice manager.  PSAMF ¶ 200; DRPSAMF ¶ 200.

### N.   April 2, 2019: David Ako-Annan Meets with Donna Ashe and Alison Worster

---

[55]   EMMC admits the allegation in PSAMF ¶ 235, but objects that it is inadmissible hearsay. DRPSAMF ¶ 235.  The Court is unsure of whether EMMC is objecting to Ms. Michaud's deposition testimony as hearsay or L.T.'s purported statements as hearsay.  Regardless, the Court overrules the objection.  Federal Rule of Civil Procedure 56(c)(1)(A) expressly permits a party opposing summary judgment to support factual assertions using deposition testimony.  Therefore, the Court declines to strike Ms. Michaud's deposition testimony as hearsay.  As for L.T.'s statements in the deposition testimony, viewing the record in the light most favorable to Mr. Ako-Annan, LT.'s statements may be opposing party statements under Federal Rule of Evidence 801(d)(2)(D) because L.T. was an EMMC employee and the statement potentially pertained to the scope of her employment duties insofar as Ms. Ashe, another EMMC employee, directed L.T. to keep a journal on Mr. Ako-Annan.  *See* FED. R. EVID. 801(d)(2)(D) (specifying that statements "made by a party's agent or employee on a matter within the scope of that relationship while it existed" are not hearsay).  Finally, the evidence of log keeping is not for the truth of the contents of the purported log but for the fact that L.T. was keeping the log and that Ms. Michaud told Mr. Ako-Annan to watch his back.

[56]   Mr. Ako-Annan qualifies this fact; however, his qualification is not supported by a citation to the record.  PRDSMF ¶ 63.  Pursuant to Local Rule 56(f), the Court "may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." The Court rejects the qualification and deems the fact admitted under Local Rule 56(f).

EMMC made no final decisions on Mr. Ako-Annan's continued employment until after a meeting on April 2, 2019.  PSAMF ¶ 201; DRPSAMF ¶ 201.[57]  On April 2, 2019, Mr. Ako-Annan met with Ms. Ashe and Ms. Worster, EMMC's Vice President of Human Resources.  *R.* ¶ 22; DSMF ¶ 64; PRDSMF ¶ 64; PSAMF ¶ 239; DRPSAMF ¶ 239.

During the meeting, Ms. Worster outlined the nature of the complaints regarding Mr. Ako-Annan's performance and said she was concerned about whether Mr. Ako-Annan could adequately perform his job.  DSMF ¶ 65; PRDSMF ¶ 65.  Ms. Ashe's memorandum of this meeting indicates that when questioned about the March 12, 2019, incident with M.G., Mr. Ako-Annan informed her and Ms. Worster that two medical assistants were planning to "attack"[58] another staff member at the morning

---

[57]    The Court modifies PSAMF ¶ 201 in response to a qualified response that EMMC interposes in DRPSAMF ¶ 201.  Mr. Ako-Annan asserts that EMMC did not make a final decision regarding his continued employment or disciplinary action until after Dr. R expressed his concerns about Mr. Ako-Annan to Ms. Ashe on March 29, 2019.  PSAMF ¶ 201.  That assertion is technically correct; however, the Court also finds EMMC's qualification that it did not reach a decision until after Mr. Ako-Annan met with Ms. Worster on April 2, 2019 as an appropriate qualification regarding the timing of EMMC's decision.  DRPSAMF ¶ 201.

[58]    EMMC interposes a qualified response to this statement, which clarifies that the two medical assistants planned to be negative at the morning meeting but denies that they planned on "attacking" one of their co-workers.  DRPSAMF ¶ 244.  In support, EMMC cites Mr. Ako-Annan's deposition testimony.  DRPSAMF ¶ 244 (citing *Ako-Annan Dep.* at 134:6-135:1).  This citation does not support EMMC's denial and the Court deems the fact admitted under Local Rule 56(f).  The factual assertion concerns the contents of a memorandum describing the April 2, 2019, meeting among Mr. Ako-Annan, Ms. Ashe, and Ms. Worster, not what actually occurred during March 12, 2019, incident with M.G.  With that said, the Court makes some observations and qualifications.  First, the memorandum that Mr. Ako-Annan cites appears to have been drafted by Ms. Ashe rather than Ms. Worster.  The first line reads: "David, Ali and I met regarding the concerns expressed from the practice in David's absence."  PRDSMF, Attach. 7, *Meeting with David Ako-Annan, April 2, 2019* at 1.  The Court therefore modifies PSAMF ¶ 244 to clarify that Ms. Ashe, not Ms. Worster, drafted this memorandum.  Second, the Court understands the qualified response in DRPSAMF ¶ 244 as clarifying that the two medical assistants did not intend to physically attack the other staff member.  The Court declines to alter the language from Ms. Ashe's memorandum, but notes that it construes the use of the word "attack" here as a verbal, rather than physical, attack.  There is no record evidence that staff at the Orono Practice intended to resort to physical violence against one another at the March 12, 2019, meeting.  Therefore, a verbal attack is most consistent with Mr. Ako-Annan's theory of the case.

meeting.  PSAMF ¶ 244; DRPSAMF ¶ 244.  Mr. Ako-Annan also said that when he tried to address the situation in a positive manner and explain that absenteeism was creating a backlog in work, one of the medical assistants became upset and left the meeting.  PSAMF ¶ 244; DRPSAMF ¶ 244.  Ms. Worster and Ms. Ashe put the blame on Mr. Ako-Annan for the poor morale at the Orono Practice and told Mr. Ako-Annan that he did not have the ability to lead the practice.  PSAMF ¶ 240; DRPSAMF ¶ 240.  At that point, Mr. Ako-Annan thought that he had been fired before EMMC had performed an investigation.  PSAMF ¶ 241; DRPSAMF ¶ 241.[59]

In response to Ms. Worster and Ms. Ashe's statements about his performance, Mr. Ako-Annan acknowledged the morale problems but did not take responsibility for the situation.  DSMF ¶ 66; PRDSMF ¶ 66.  Instead, Mr. Ako-Annan blamed Ms. Ashe. DSMF ¶ 66; PRDSMF ¶ 66.  He complained that: (1) "he was told before he left on vacation to watch his back because his boss was up in Orono taking lunch to the providers and meeting with them," (2) he "feels the discontent is coming from Dr. R due to [Mr. Ako-Annan's] recent issues with [M.G.]," (3) his treatment was "retaliation" from Ms. Ashe "for the way he was treated before,"[60] (4) "there is a case

---

[59]    EMMC interposes a qualified response to this fact, asserting that Mr. "Ako-Annan thought he had been fired before the investigation was completed."  DRPSAMF ¶ 241 (citing *Ako-Annan Dep.* at 137:18-138:12).  The Court recognizes that the portion of the record EMMC cites seems to establish that (1) Mr. Ako-Annan was aware of an ongoing investigation into the Orono Practice, (2) Mr. Ako-Annan was interviewed as part of the investigation, and (3) Mr. Ako-Annan was not aware when the investigation was completed.  *Ako-Annan Dep.* at 137:18-138:12.  However, Mr. Ako-Annan also cites a later portion of his own deposition that states he thought he had been fired without a prior investigation.  *See* PSAMF ¶ 241 (citing *Ako-Annan Dep.* at 140 ("So I thought, well, I got fired before even having an investigation done")).  Despite the contradictions in Mr. Ako-Annan's deposition testimony, the Court must construe the record in the light most favorable to him and accepts his statement of fact as written.

[60]    PSAMF ¶ 245 asserts that "Mr. Ako-Annan informed Ms. Worster that he believed the issues being raised were coming from Ms. Ashe who was retaliating for his prior concerns about Ms. Ashe."  PSAMF ¶ 245 (citing *Ako-Annan Dep.* at 143:2-14).  EMMC denies this statement as unsupported by

right now that he has testified for against EMHS where a person is losing their job for bringing forth [what] was done to [Mr. Ako-Annan]," (5) "someone had changed his daily charges posted numbers on his spreadsheet on the W:drive," and (6) he "was fed up with FMLA and the shortage of staff and he had no recourse."  DSMF ¶ 67; PRDSMF ¶ 67, (quoting Attach. 7, *Meeting with David Ako-Annan, April 2, 2019* at 1-2).[61]  Mr. Ako-Annan also told Ms. Worster that staff had told him to watch his back for drama and that he did not have any power because Ms. Ashe was his supervisor.  PSAMF ¶ 242; DRPSAMF ¶ 242.  In her deposition, Ms. Worster agreed that Ms. Ashe should not be meeting with staff to discuss gossip or to undermine Mr. Ako-Annan.  PSAMF ¶ 243; DRPSAMF ¶ 243.

Ms. Worster explained to Mr. Ako-Annan that she would need to investigate his claim of retaliation against Ms. Ashe and asked Mr. Ako-Annan to identify the source of his information.  DSMF ¶ 68; PRDSMF ¶ 68.  Mr. Ako-Annan became uncomfortable and refused to give Ms. Worster any names or any additional information because of his prior experiences at EMMC, including the case involving

---

the cited portion of Mr. Ako-Annan's deposition testimony.  DRPSAMF ¶ 245 (citing *Ako-Annan Dep.* at 143:2-14).  The Court accepts EMMC's denial and strikes PSAMF ¶ 245 pursuant to Local Rule 56(f) because the record citation does not support the proffered fact.  Nevertheless, the Court includes the substance of PSAMF ¶ 245 pursuant to is discussion in footnote 61.

[61]     EMMC's statement of Mr. Ako-Annan's complaints was that "I mentioned to her that when you have a supervisor that, you know, your staff is telling you to watch your back for drama and all those kind of things, it is very difficult for you to – to run the practice and also to gain the respect and support from your subordinates, because it was like my supervisor, this is me, and that was a huge problem. When the manager feels like, you know, I don't have any power, I will not be listened to, they'd rather listen to something coming from Donna versus – versus David. If that happens, then David is just a rubber stamp."  DSMF ¶ 67.  Mr. Ako-Annan interposed a qualified response that "[t]his description is an incomplete version of what Mr. Ako Annan said at the meeting.  A complete version of Ms. Worster's memorandum of what she attributes to Mr. Ako Annan is set forth in Exhibit 57."  PRDSMF ¶ 67.  Construing the record in the light most favorable to Mr. Ako-Annan, the Court cites the exhibit Mr. Ako-Annan referenced, rather than his own deposition testimony that EMMC cited in DSMF ¶ 67.

L.R., and Mr. Ako-Annan's concerns that EMMC had not done anything to address his prior claims of discrimination.   DSMF ¶ 69; PRDSMF ¶ 69; PSAMF ¶ 246; DRPSAMF ¶ 246.[62]

Additionally, Mr. Ako-Annan alluded to L.R.'s case without identifying L.R. by name, and told Ms. Worster that a person raising allegations similar to his own was being fired and that human resources had not done anything to address his prior concerns of discrimination.   PSAMF ¶ 247; DRPSAMF ¶ 247.[63]   Ms. Worster asked Mr. Ako-Annan who he was talking about, but he refused to tell her.   PSAMF ¶ 247; DRPSAMF ¶ 247.   Ms. Worster then told Mr. Ako-Annan that she could not investigate his claims if she did not know the facts; however, Mr. Ako-Annan still refused to tell her.   PSAMF ¶ 247; DRPSAMF ¶ 247.   Mr. Ako-Annan also told Ms. Worster that he did not need his job.   DSMF ¶ 70; PRDSMF ¶ 70.

Ms. Worster gave Mr. Ako-Annan a direct order to provide her with information corroborating his claims that Ms. Ashe was retaliating against him, but Mr. Ako-Annan still refused.   DSMF ¶ 71; PRDSMF ¶ 71.[64]   She then told Mr. Ako-Annan that he had twenty-four hours to provide the names of staff that she should talk to, information to support his allegations, or information that she should

---

[62]   The Court accepts Mr. Ako-Annan's qualification of DSMF ¶ 69.

[63]   EMMC interposes a qualified response to PSAMF ¶ 247, which the Court accepts.   The memorandum that PSAMF ¶ 247 cites indicates that Mr. Ako-Annan refused to specify the name of the individual involved in this other litigation.  *See Meeting with David Ako-Annan, April 2, 2019* at 1. The Court modified the factual assertion to be consistent with the cited portion of the record.

[64]   Mr. Ako-Annan qualifies this statement of fact, writing that "[w]hen Ms. Worster requested that Mr. Ako Annan provide her with additional information within 24 hours, Mr. Ako Annan believed he had already been fired so doing so would not matter."   PRDSMF ¶ 71.   The Court accepts this qualification but declines to alter the statement of fact because it incorporates Mr. Ako-Annan's qualification in a later portion of the facts section.

consider in response to the staff and provider complaints against him.  DSMF ¶ 72; PRDSMF ¶ 72.  At the end of the meeting, Ms. Worster and Ms. Ashe took Mr. Ako-Annan's security badge and did not permit him to return to his office.  PSAMF ¶ 249; DRPSAMF ¶ 249.

Mr. Ako-Annan did not provide Ms. Worster with the information she requested, and Ms. Worster therefore decided to terminate his employment with EMMC.  DSMF ¶ 73; PRDSMF ¶ 73.[65]   Mr. Ako-Annan did not provide the information because he believed that he had already been fired when Ms. Worster and Ms. Ashe said they did not believe he could lead the Orono Practice.  PRDSMF ¶ 73; PSAMF ¶ 248, DRPSAMF ¶ 248.

On April 4, 2019, Ms. Worster sent Mr. Ako-Annan a letter terminating his employment.  *R.* ¶ 23.  The ultimate decision-maker, Ms. Worster, relied on the investigation of Ms. Ashe, among other sources of information in reaching her decision to terminate Mr. Ako-Annan.  PSAMF ¶ 250; DRPSAMF ¶ 250.  As grounds for termination, Ms. Worster cited Mr. Ako-Annan's failure to provide the requested information to her or any potentially mitigating information related to the staff and provider complaints against him.  DSMF ¶ 74; PRDSMF ¶ 74.  EMMC's human resources department did not deem Mr. Ako-Annan's staffing concerns relevant to his managerial capabilities leading up to his termination.  PSAMF ¶ 155; DRPSAMF ¶ 155.

---

[65]     Mr. Ako-Annan admits these factual statements by EMMC.  PRDSMF ¶ 73.  He qualifies the statements, noting that he did not comply with Ms. Worster's order because he believed he had already been fired.  PRDSMF ¶ 73.  The Court accepts the qualification and includes it as the next sentence.

After Mr. Ako-Annan was terminated, EMMC combined the Orono Practice and University of Maine Cutler Health Center practices, and R.S., a white female, was named the joint practice manager. PSAMF ¶ 251; DRPSAMF ¶ 251. On June 19, 2020, the Bangor Daily News published an article entitled "Northern Light Plans to Address Bias." PSAMF ¶ 90; DRPSAMF ¶ 90.[66] In the article, EMMC's parent corporation, Northern Light Health, announced that it would identify "all explicit bias and implicit bias within Northern Light Health . . . ." PSAMF ¶ 91; DRPSAMF ¶ 91. Northern Light Health further announced that it would review its disciplinary practices as part of its discrimination review and that it would provide new anti-discrimination training for its staff and employees. PSAMF ¶ 92; DRPSAMF ¶ 92.

## O.  David Ako-Annan's Allegations of Sex Discrimination Against Donna Ashe

The Court draws the entirety of this section from PSAMF ¶ 129, Mr. Ako-Annan's paragraph with twenty-seven subparts.[67] Relying on Local Rule 56(f) and *Perez v. Volvo Car Corporation*, 247 F.3d 303, 317-18 (1st Cir. 2001), EMMC argues that paragraph 129 "should be stricken because the purported assertions are only

---

[66] The Court modifies this statement of fact in response to a denial by EMMC that Northern Light "participated in the publication of the article." DRPSAMF ¶ 90. EMMC correctly observes that the article does not support the assertion that Northern Light participated in the article's publication. DRPSAMF ¶ 90; PSAMF, Attach. 31, *Northern Light Plans to Address Bias*, Bangor Daily News, June 19, 2020. The Court declines to strike the fact completely, but instead modifies it to accurately reflect the record.

[67] PSAMF ¶ 129 and its twenty-seven subparagraphs are the functional equivalent of a table in violation of Local Rule 56(b). Local Rule 56(b) provides that "[e]ach footnote asserted in the statement shall be simply and directly stated in narrative without footnotes or tables." D. ME. LOC. R. 56(b).

The Court agrees with EMMC and could strike PSAMF ¶ 129 for violating the footnote and table provisions of the Rule but declines to do so. The allegations in the paragraph are essential to Mr. Ako-Annan's claims of sex discrimination and to strike the assertions would be too harsh a sanction to punish Mr. Ako-Annan for his counsel's noncompliance with Local Rule 56(b). The Court encourages counsel to refrain from similar submissions in the future.

'gauzy generalities,' not specific assertions of fact, are not supported by the records cited (or any record citation at all) and are not based on personal knowledge." DRPSAMF ¶ 129. The Court overrules EMMC's blanket objection. The introductory section of PSAMF ¶ 129 includes a footnote that states "All of the subsections in this paragraph are supported by Mr. Ako-Annan's answer to interrogatory 5. Secondary citations to deposition testimony in accord are also provided when applicable." PSAMF ¶ 129 n.1. The Court declines to strike this footnote although it violates Local Rule 56(b). The Court finds it unduly prejudicial to materially sanction Mr. Ako-Annan for his counsel's failure to comply with Local Rule 56.

As for EMMC's other objections, the Court finds it appropriate to consider whether each factual assertion is independently supported by the record or too conclusory. Accordingly, the Court overrules EMMC blanket objections to PSAMF ¶ 129 but resolves the objections as applied to each subparagraph.[68] The first

---

[68]    Pursuant to this approach, the Court declines to incorporate the following factual assertions by Mr. Ako-Annan.

    **Paragraph 129(b):**  EMMC objects to this fact as unsupported by the record citation. DRPSAMF ¶ 129(b). Mr. Ako-Annan cites (1) his response to interrogatories and (2) a portion of his deposition testimony. The deposition testimony does not support Mr. Ako-Annan's assertion that Ms. Ashe socialized with the female practice managers but not him. *See Ako-Annan Dep.* at 67:23-68:6. In fact, the cited portion of Mr. Ako-Annan's deposition recounted an instance in which Ms. Ashe invited Mr. Ako-Annan to go out for drinks with her and the other practice managers. *Id.* Nevertheless, Mr. Ako-Annan's interrogatory response states that Ms. Ashe "[s]ocializ[ed] with the women practice providers but not [him]." PRDSMF, Attach. 1, *Pl.'s Answers to Def. Eastern Maine Medical Center's First Set of Interrogs.* at 2 (*Ako-Annan Interrog. Resp.*). The statement from the interrogatory responses is conclusory, not supported by reference to a specific instance or other evidence, and directly contradicts Mr. Ako-Annan's deposition testimony. The Court does not include it because it is a "conclusory allegation" and constitutes "unsupported speculation." *See Tropigas De P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (stating that when ruling on a motion for summary judgment, a court "afford[s] no evidentiary weight to conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative") (quotation omitted). Separately, the Court rejects EMMC's denial of the PSAMF ¶ 129(b) because that denial relies on Mr. Ako-Annan's deposition testimony about his interactions with Ms. Lavallee, not Ms. Ashe. *See* DRPSAMF ¶ 129(b) (citing *Ako-Annan Dep.* at 38:13-39:10).

---

**Paragraph 129(c):** EMMC objects to PSAMF ¶ 129(c), stating "[t]he record citation does not support the fact asserted and should therefore be stricken." DRPSAMF ¶ 129(c). Specifically, EMMC argues that the assertion that Ms. Ashe "manufactured a reason" is "not based on [Mr. Ako-Annan's] personal knowledge and is mere speculation." DRPSAMF ¶ 129(c). EMMC further argues that Mr. Ako-Annan lacks personal knowledge concerning Ms. Ashe's treatment of other practice managers and therefore his testimony is inadmissible under Federal Rule of Evidence 602. DRPSAMF ¶ 129(c). The Court agrees that Mr. Ako-Annan lacks the personal knowledge to testify as to Ms. Ashe's state of mind and whether Ms. Ashe, in fact, "manufactured" reasons to terminate her meetings with Mr. Ako-Annan. The assertion is speculation about Ms. Ashe's state of mind grounded only in Mr. Ako-Annan's subjective beliefs. Therefore, the Court declines to include PSAMF ¶ 129(c). At most, Mr. Ako-Annan may testify as to his own subjective belief that Ms. Ashe "manufactured" reasons to terminate their meetings and explain the reasons for his belief. Therefore, the Court strikes the PSAMF ¶ 129(c).

EMMC also argues the facts contained in PSAMF ¶ 129(c) are unsupported by the record citations. DRPSAMF ¶ 129(c). The Court overrules the denial. Although the cited portions of Mr. Ako-Annan's deposition testimony do not support the factual assertion, PSAMF ¶ 129(c) is essentially a word-for-word recitation of an interrogatory response by Mr. Ako-Annan. *Compare Ako-Annan Dep.* at 51:1-4 *and Ako-Annan Interrog. Resp.* at 2.

**Paragraph 129(e):** EMMC objects to PSAMF ¶ 129(e) "because it is without citation to authority" in violation of Local Rule 56(f). DRPSAMF ¶ 129(e). Additionally, EMMC objects that Mr. Ako-Annan "has not demonstrated the requisite personal knowledge to testify as to Ms. Ashe's treatment of the other practice managers or that this 'instance' was based on different standards for his female counterparts or other disparities based on sex." DRPSAMF ¶ 129(e). EMMC also denies the PSAMF ¶ 129(e) as unsupported by a record citation and noting that Mr. Ako-Annan's improper footnote does not cure the lack of corroborating authority. DRPSAMF ¶ 129(e).

EMMC is correct that PSAMF ¶ 129(e) does not contain a record citation. DRPSAMF ¶ 129(e). However, PSAMF ¶ 129 n.1 specifies that support for the assertion is found in Mr. Ako-Annan's response to interrogatories. Regardless, the interrogatory response is a conclusory allegation that the Court does not credit. *See Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 44 (1st Cir. 2018) ("It is hornbook law that a plaintiff cannot avoid summary judgment by relying solely on conclusory allegations"). The Court strikes PSAMF ¶ 129(e).

**Paragraph 129(f):** EMMC objects that PSAMF ¶ 129(f) is unsupported by Mr. Ako-Annan's record citation and denies that Ms. Ashe instigated drama at the Orono Practice. DRPSAMF ¶ 129(f). The Court agrees that the cited portions of Mr. Ako-Annan's deposition testimony do not provide a factual basis on which a reasonable factfinder could find the factual assertions in PSAMF ¶ 129(f). At most, the cited deposition testimony provides conclusory assertions and Mr. Ako-Annan's subjective beliefs about Ms. Ashe's behavior. *See Ako-Annan Dep.* at 66:2-3 ("Whenever [Ms. Ashe] finds her way to the practices, she's there for dramatics"); *id.* at 78:25-79:3 (Q. Who was L.T.? A. She was one of my referral specialists. Q. So she was a subordinate of yours at the Orono Practice? A. That is correct"); *id.* at 96:6-10 ("There wasn't the support I need. Support were taken from Orono to other places. The . . . nutshell is my supervisor was looking for Orono's failure, and when Orono failed, the manager fails. That is how I felt like, you know"); *id.* at 105:13-19 ("Q. Okay. My question was as of the late fall of 2017 did you believe that your relationship with [Ms.] Ashe had improved and things were going very well? Yes or no? A. I believe that was on a -- on and off. Q. Okay. A. Not consistent"). In addition, the Court concludes the cited portion of Mr. Ako-Annan's interrogatory response is a conclusory allegation and speculation that the Court may not credit on a motion for summary judgment. *See Ako-Annan Interrog. Resp.* at 3; *Mancini*, 909 F.3d at 44. The Court therefore strikes PSAMF ¶ 129(f). Because the Court strikes PSAMF 129(f) as unsupported by the evidence and conclusory, the Court declines to rule on EMMC's denial of PSAMF ¶ 129(f).

**Paragraph 129(g):** EMMC objects that this paragraph should be "partially stricken because the record cited does not support the assertions that [Ms.] Ashe withdrew necessary support for [Mr.] Ako-Annan, that she let it be known to his staff that he was the source of the difficulties or that poor morale in the practice was the result of [Ms.] Ashe not being there unlike at other practices."

paragraph of PSAMF ¶ 129 is introductory, conclusory, and unsupported by a record citation and therefore, the Court declines to include it as fact.

In response to interrogatories from EMMC, Mr. Ako-Annan identifies numerous instances in which he says Ms. Ashe treated him differently than the female practice managers at EMMC's other primary care practices. PSAMF ¶ 129. For example, he asserts that Ms. Ashe spent far more time at the other EMMC primary care practices than she did at the Orono Practice; however, the other

---

DRPSAMF ¶129(g). Additionally, EMMC interposes a qualified response that admits Mr. "Ako-Annan had to deliver major changes in hospital policy and that there was poor morale in the practice" but otherwise denies PSAMF ¶ 129(g) as unsupported by the record. DRPSAMF ¶ 129(g). The Court read the deposition testimony, which discusses Mr. Ako-Annan's efforts to boost morale at the practice by bringing in refreshments for the staff and concludes it does not support the allegations in PSAMF ¶ 129(g). The cited testimony does not reference Ms. Ashe. *See Ako-Annan Dep.* at 81:8-25; *id.* at 82:1-12. In addition, the allegations contained in Mr. Ako-Annan's interrogatory response is conclusory speculation that the Court may not credit on a motion for summary judgment. *Mancini*, 909 F.3d at 44.

  **Paragraph 129(k):** EMMC objects that this paragraph should be partially stricken as unsupported by a record citation. DRPSAMF ¶ 129(k). The Court agrees. Neither the cited portion of Mr. Ako-Annan's deposition testimony nor his responses to EMMC's interrogatories provide support for the conclusion that Ms. Ashe ordered L.T. and S.N. to work for other practices "many times" without "discussing it with Mr. Ako-Annan." PSAMF ¶ 129(k). Nor does the cited material support the proposition that L.T. was only in the Orono Practice "50-60% of the time because of her medical approved absences." PSAMF ¶ 129(k). The interrogatory responses never mention these facts and the cited portion of Mr. Ako-Annan's deposition testimony does not either. *See Ako-Annan Dep.* at 79:13-17; *Ako-Annan Interrog. Resp.* at 2-6. Given that striking these portions of paragraph 129(k) substantially undercuts the substance of the paragraph, the Court strikes the entire paragraph. This does not prejudice Mr. Ako-Annan because the remainder of his factual assertions are contained in PSAMF ¶ 129(j), which the Court includes. Because the Court strikes the entire paragraph, it declines to consider EMMC's qualification. *See* DRPSAMF ¶ 129(k).

  **Paragraph 129(l):** EMMC objects that this paragraph "should be stricken because there is no record citation." DRPSAMF ¶ 129(l). The Court agrees and strikes the paragraph pursuant to Local Rule 56(f). Although Mr. Ako-Annan cites his interrogatory responses for all assertions in paragraph 129, the interrogatory responses do not contain the allegations in PSAMF ¶ 129(l). Because the Court strikes the paragraph, it declines to rule on EMMC's qualified response to PSAMF ¶ 129(l).

  **Paragraph 129(o):** EMMC objects that this fact should be stricken "because there is no record citation." DRPSAMF ¶ 129(o). The Court observes that Mr. Ako-Annan cited his interrogatory response for support, PSAMF ¶ 129 n.1, but nevertheless strikes the PSAMF ¶ 129(o) as argumentative and conclusory. The "fairness" of an action is not a fact. Because the Court strikes PSAMF ¶ 129(o), it declines to consider EMMC's qualification in DRPSAMF ¶ 129(o).

practices "were going through a lot." PSAMF ¶ 129(a); DRPSAMF ¶ 129(a).[69] When Ms. Ashe would meet with Mr. Ako-Annan, she would interrogate him, rather than work collaboratively. PSAMF ¶ 129(d); DRPSAMF ¶ 129(d).[70] This behavior was very different from Ms. Ashe's interactions with the female practice managers and Orono Practice's female staff and female providers. PSAMF ¶ 129(d); DRPSAMF ¶ 129(d).[71]

---

[69]     EMMC objects that this assertion should be struck because Mr. Ako-Annan lacks the personal knowledge that Ms. Ashe was spending more time at the other practices than at the Orono Practice. DRPSAMF ¶ 129(a). A non-movant cannot defeat a motion for summary judgment by relying on interrogatory responses outside the scope of the non-movant's personal knowledge. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir. 1990) ("Although [interrogatory responses] may be given effect so far as they are admissible under the rules of evidence, they should be accorded no probative force where they are not based upon personal knowledge or are otherwise deficient"). Here, however, the Court finds Mr. Ako-Annan has the requisite personal knowledge. PSAMF ¶ 129(a) relies on Mr. Ako-Annan's responses to interrogatories and his deposition testimony. Although the source of Mr. Ako-Annan's personal knowledge is not apparent from his interrogatory response, he was asked during his deposition how he knew that Ms. Ashe was spending more time in other practices. *Ako-Annan Dep.* 70:9-10. Mr. Ako-Annan responded that he would sometimes need to contact Ms. Ashe but be unable to reach her at her own office and then find out that she was at other primary care practices and have to contact her at those practices. *Ako-Annan Dep.* at 70:11-22. The Court therefore accepts that Mr. Ako-Annan's personal experiences working with Ms. Ashe as his supervisor provide a sufficient basis to conclude he had personal knowledge that Ms. Ashe spent more time in other practices than the Orono Practice.

         EMMC also interposes a qualified response that Mr. Ako-Annan testified Ms. Ashe spent more time at other primary care practices because those practices "were going through a lot" and it had nothing to do with the gender of the practice manager. DRPSAMF ¶ 129(a) (quoting *Ako-Annan Dep.* at 70:4-71:4). The Court accepts the qualified response in part and modified PSAMF ¶ 129(a). The Court rejects EMMC's qualified response to the extent that it asserts the sole reason Ms. Ashe spent more time at the other primary care practices was because they "were going through a lot." Construing the deposition testimony in the light most favorable to Mr. Ako-Annan, it does not establish that was the only reason for Ms. Ashe's actions.

[70]     EMMC objects to PSAMF ¶ 129(d) and interposes a qualified response. DRPSAMF ¶ 129(d). However, PSAMF ¶ 129(d) is two sentences and the objections and qualifications do not pertain to the first sentence. The Court deems the first sentence admitted under Local Rule 56(f).

[71]     EMMC objects to this fact as unsupported by the record in violation of Local Rule 56(f), and as not based on personal knowledge under Federal Rule of Evidence 602; EMMC also interposes a qualified response that denies Mr. Ako-Annan "observed [Ms.] Ashe interact with other female practice managers" and instead asserts Mr. "Ako-Annan and another *female* practice manager suspected and gossiped that [Ms.] Ashe had favorite practice managers" but denies "that any favoritism was based on sex." DRPSAMF ¶ 129(d) (citing *Ako-Annan Dep.* at 71:5-74:2).

         The Court rejects EMMC's claim that PSAMF ¶ 129(d) is unsupported by Mr. Ako-Annan's record citation or lacking in personal knowledge. Construing the record in the light most favorable to Mr. Ako-Annan, the Court accepts that by working with Ms. Ashe and the other practice managers for several years, Mr. Ako-Annan has the requisite personal knowledge to compare Ms. Ashe's treatment

Despite concerns being raised by the providers within the Orono office that they were seeing too many patients, and their requests to close their practices to new patients, Ms. Ashe would not allow Mr. Ako-Annan to close the practice to new patients. PSAMF ¶ 129(h); DRPSAM ¶ 129(h).[72] Rather than providing Mr. Ako-Annan with additional staff, Ms. Ashe diverted some of the Orono providers and his best staff to other practices. PSAMF ¶ 129(i); DRPSAMF ¶ 129(i).[73] For example,

---

of him to her treatment of other practice managers. The cited portions of Mr. Ako-Annan's deposition testimony provide support for Mr. Ako-Annan's claim that Ms. Ashe "interrogated" him, and that he knew how she treated the other practice managers from sitting in on meetings with Ms. Ashe and the other practice managers. *See Ako-Annan Dep.* at 52:22-53:6 ("I mentioned . . . how she spend most of the time in the female practices than our practice, and whenever she comes to the practice, it's to interrogate or do some investigation"); *see also Ako-Annan Dep.* at 69:20-70:11 ("I felt [Ms. Ashe] listened to them more during managers meeting, . . . whichever suggestion I bring, I felt like I'm looked down on, looked down on my views"). The Court overrules EMMC's objections and the qualification.

[72]   EMMC objects that this fact should be stricken as unsupported by a record citation. DRPSAMF ¶ 129(h). The Court overrules this objection. Pursuant to PSAMF ¶ 129 n.1, the allegation is supported by Mr. Ako-Annan's interrogatory responses. EMMC also objects that "[t]he concerns raised by providers and requests to close practices is also inadmissible hearsay" under Federal Rules of Evidence 802 and 803. The Court also overrules this objection. It is premature to exclude the statements as hearsay at the motion for summary judgment stage. While the statements of providers may be hearsay, the Court cannot be certain. First, Mr. Ako-Annan may not be offering the statements for their truth, but for another purpose such as showing that the providers made the complaints, demonstrating that Mr. Ako-Annan and Ms. Ashe had notice of provider complaints, or establishing that Mr. Ako-Annan relayed the complaints to Ms. Ashe. Second, the provider statements may be opposing party statements under Federal Rule of Evidence 801(d)(2). Third, the request to close the Orono Practice to new patients is not an assertion of fact, and therefore, the Court is unsure how Mr. Ako-Annan could be offering that statement for its truth.

In addition, EMMC interposes a qualified response, admitting the facts subject to the previous objection but denying that Ms. Ashe's refusal to permit closing the practice to new patients "had anything to do with [Mr. Ako-Annan's] sex, as the introductory paragraph 129 implies since there is no record evidence and [Mr. Ako-Annan] lacks the requisite personal knowledge to support that proposition." DRPSAMF ¶ 129(h). The Court rejects the qualification and deems the fact admitted pursuant to Local Rule 56(f). EMMC's purported qualification is an argument about the significance of the fact and the Court is required to view the facts in the light most favorable to Mr. Ako-Annan.

[73]   EMMC objects to PSAMF ¶ 129(i) and says it "should be stricken because it is not supported by a record citation." DRPSAMF ¶ 129(i). The Court overrules the objection because Mr. Ako-Annan cited his interrogatory responses and those responses support the assertion. PSAMF ¶ 129 n.1; *Ako-Annan Interrog. Resp.* at 3. EMMC further objects that this is not evidence that "demonstrates differential treatment or standards." DRPSAMF ¶ 129(i). The Court overrules this objection as argument about the significance of the fact and the Court is required to view the facts in the light most favorable to Mr. Ako-Annan.

EMMC also interposes a qualified response to PSAMF ¶ 129(i), which admits that Ms. Ashe sent S.W. and R.S. to other practices but "den[ies] that it was based on [Mr. Ako-Annan's] sex as the introductory paragraph 129 implies since that assertion is not supported by any record evidence and

Ms. Ashe reassigned S.W. to the Brewer Practice and R.S. was sent to Walk-In-Care, even though these transfers left the Orono Practice shorthanded.  PSAMF ¶ 129(i); DRPSAFM ¶ 129(i).[74]

Mr. Ako-Annan's referral staff, L.T., a friend of Ms. Ashe, was often asked by Ms. Ashe to help with other referrals for other practices without Mr. Ako-Annan's knowledge.  PSAMF ¶ 129(j); DRPSAMF ¶ 129(j).[75]  This occurred even though the Orono Practice was backlogged on its own referrals.  PSAMF ¶ 129(j); DRPSAMF ¶ 129(j).  Ms. Ashe also assigned L.T. to perform payroll work for other practices.  PSAMF ¶ 129(j) L.T. informed Mr. Ako-Annan that Ms. Ashe asked her to do this payroll work.  PSAMF ¶ 129(j); DRPSAMF ¶ 129(j).

Although Mr. Ako-Annan was responsible for hiring staff at the Orono Practice, open staff positions were not filled or were put on hold, creating more work

---

[Mr. Ako-Annan] lacks the requisite personal knowledge."  DRPSAMF ¶ 129(i).  EMMC further states that the only example Mr. Ako-Annan gave during his deposition of Ms. Ashe "diverting" staff from the Orono Practice to other practices was when Ms. Ashe agreed Mr. Ako-Annan should give his open position to an endocrinology practice managed by a named Ron.  DRPSAMF ¶ 129(i) (citing *Ako-Annan Dep.* at 75:8-76:5).  The Court rejects the qualified response and deems the fact admitted under Local Rule 56(f).  As mentioned above, Mr. Ako-Annan's interrogatory response provides sufficient evidentiary support for the assertion contained in PSAMF ¶ 129(i).  Moreover, any challenge to whether Ms. Ashe's conduct was motivated by sex discrimination is argumentative.

[74]   The Court includes this fact for the reasons stated in footnote 73.

[75]   EMMC objects that PSAMF ¶ 129(j) should be stricken as unsupported by a record citation.  DRPSAMF ¶ 129(j).  EMMC also objects to the implication that this instance "demonstrates differential treatment or standards" as unsupported by the record and claims Mr. Ako-Annan lacks sufficient personal knowledge to demonstrate Ms. Ashe treated Mr. Ako-Annan differently because of his sex.  DRPSAMF ¶ 129(j).  The Court overrules both objections.  Mr. Ako-Annan's interrogatory response supports the assertions contained in PSAMF ¶ 129(j).  *See Ako-Annan Interrog. Resp.* at 3.  EMMC's second objection is argumentative as to the significance of the fact and the Court overrules this objection.

   EMMC also interposes the qualification that "From time to time [Ms.] Ashe assigned L.T. to do certain duties like payroll or referrals for other practices."  DRPSAMF ¶ 129(j).  The Court rejects this qualification and deems PSAMF ¶ 129(j) admitted under Local Rule 56 because EMMC's qualification is substantially the same as Mr. Ako-Annan's asserted fact.

for less staff.  PSAMF ¶ 129(m); DRPSAMF 129(m).[76]  Ms. Ashe requested that Mr.

Ako-Annan give out his budgeted and open positions to help EMMC's Hampden and

Diabetic and Endocrinology practices.  PSAMF ¶ 129(n); DRPSAMF ¶ 129(n).[77]  A

man named Ron managed the endocrinology practice and Mr. Ako-Annan

acknowledges that Ms. Ashe told him the endocrinology practice needed the position

more than the Orono Practice.  PSAMF ¶ 129(n); DRPSAMF ¶ 129(n) (citing *Ako-*

*Annan Dep.* at 75:8-76:5).

On one occasion, Mr. Ako-Annan recruited a high-level nurse practitioner (NP)

to join the Orono Practice, but Ms. Ashe diverted her to another practice.  PSAMF

¶ 129(p); DRPSAMF ¶ 129(p).[78]  When the NP insisted that she wanted to work at

---

[76]     The Court overrules EMMC's objection that this fact should be stricken as unsupported by a record citation.  DRPSAMF ¶ 129(m).  PSAMF ¶ 129 n.1 cites Mr. Ako-Annan's interrogatory responses, which confirm this fact.  *See Ako-Annan Interrog. Resp.* at 4 ("Staff positions were either not filled or put on hold, creating more work for less people").  The Court also overrules as argumentative EMMC's objection that this fact is not evidence of sex discrimination.  The Court does, however, accept EMMC's qualification that Mr. Ako-Annan was responsible for hiring staff at the Orono Practice.  DRPSAMF ¶ 129(m) (citing *R.* ¶ 6).  The stipulation includes the fact and therefore, Court modifies Mr. Ako-Annan's factual assertion to include the stipulation.

[77]     EMMC objects to the inclusion of PSAMF ¶ 129(n) as not supporting the assertion that this fact is evidence of sex discrimination or Ms. Ashe's disparate treatment of Mr. Ako-Annan.  DRPSAMF ¶ 129(n).  The Court overrules this objection as argumentative.  EMMC also interposes a qualified response to PSAMF ¶ 129(n) and admits Mr. Ako-Annan "agreed to give out his budgeted position to help Hampden and the Diabetic and Endocrinology practices" but rejects any implication that this occurred because Mr. Ako-Annan was a man.  DRPSAMF ¶ 129(n).  EMMC points to deposition testimony from Mr. Ako-Annan that says a man named Ron managed the endocrinology practice and needed the position more and therefore EMMC denies that Ms. Ashe requesting that Mr. Ako-Annan give up the staff position is evidence of sex discrimination.  DRPSAMF ¶ 129(n) (citing *Ako-Annan Dep.* at 75:8-76:5).  The Court finds the gender of the endocrinology practice manager and Mr. Ako-Annan's acknowledgement that the endocrinology practice needed the position more are relevant to Mr. Ako-Annan's claims of gender discrimination and includes the fact.

[78]     EMMC objects that PSAMF ¶ 129(p) should be stricken because it is not accompanied by a record citation.  DRPSAMF ¶ 129(p).  The Court overrules the objection because PSAMF ¶ 129(p) contains a citation to Mr. Ako-Annan's interrogatory responses and the citation supports the facts contained in PSAMF ¶ 129(p).  EMMC also objects that the fact is not evidence of "differential treatment or standards."  The Court overrules this objection as argumentative.

EMMC also interposes a qualified response which admits the allegations contained in PSAMF ¶ 129(p) but denies that PSAMF ¶ 129(p) is evidence of sex discrimination.  The Court rejects the qualification as argumentative and deems PSAMF ¶ 129(p) admitted under Local Rule 56(f), (g).

the Orono Practice, EMMC withdrew support for hiring her.   PSAMF ¶ 129(p);
DRPSAMF ¶ 129(p).  Ms. Ashe and Dr. S refused to support the NP's request because
they wanted her to work at the Husson Family Medicine practice.  PSAMF ¶ 129(p);
DRPSAMF ¶ 129(p).  This caused the NP to decline an offer from EMMC.  PSAMF
¶ 129(p); DRPSAMF ¶ 129(p).

A month or so later, the Orono Practice hired a physician's assistant (PA) and
offered her more money than the NP previously requested.   PSAMF ¶ 129(q);
DRPSAMF ¶ 129(q).[79]  Mr. Ako-Annan brought this disparity to his supervisors, Dr.
S and Ms. Ashe, as well as EMMC's business team, but they refused to respond to
Mr. Ako-Annan's email.   PSAMF ¶ 129(q); DRPSAMF ¶ 129(q).   When EMMC's
business team later told Mr. Ako-Annan that pay levels for Allied Health
Practitioners would be increased, Mr. Ako-Annan asked if he could reach out to the
original NP candidate because she was his first choice, and pointed out the NP would
need only a few years of physician supervision, while the PA who would require
permanent supervision.  PSAMF ¶ 129(r); DRPSAMF ¶ 129(r).[80]  Ms. Ashe told Mr.

---

[79]    EMMC objects that this statement should be stricken because there is no record citation and
because it is not evidence of differential treatment on the basis of Mr. Ako-Annan's sex.  DRPSAMF
¶ 179(q).  The Court overrules both objections.  First, PSAMF ¶ 129(q) is supported by a record citation.
*See* PSAMF ¶ 129(q) (citing *Ako-Annan Interrog. Resp.*).   Second, the claim that the facts in PSAMF
¶ 129(q) are not evidence of sex discrimination is argumentative.
        EMMC also interposes a qualified response, admitting the factual assertions in PSAMF
¶ 129(q) but urging that "to the extent the introductory paragraph in 129 implies that this instance
was based on [Mr. Ako-Annan's] sex, the record citation does not support that and [Mr. Ako-Annan]
lacks the requisite knowledge so it is therefore denied."  DRPSAMF ¶ 129(q).  The Court overrules the
qualification as argumentative, and not based in other facts in the record.  Pursuant to Local Rule
56(f), the Court deems the facts in PSAMF ¶ 129(q) admitted.
[80]    EMMC objects to PSAMF ¶ 129(r) as unsupported by a record citation and to the extent Mr.
Ako-Annan purports to imply that this fact "demonstrates differential treatment or standards."
DRPSAMF ¶ 129(r).   The Court overrules both objections.   First, PSAMF ¶ 129(r) cites Mr. Ako-
Annan's interrogatory responses for support and the interrogatory responses sufficiently support his

Ako-Annan that he should not fixate on hiring the NP and should instead focus on the new PA hire.  PSAMF ¶ 129(r); DRPSAMF ¶ 129(r).[81]

On another occasion, Mr. Ako-Annan requested that Ms. Ashe provide him with a front-end coordinator and an office or clinical supervisor to assist him with management of the practice because he had to work even when on vacation and overseas.  PSAMF ¶ 129(s); DRPSAMF ¶ 129(s).[82]  All EMMC's other primary care practices had registered nurse supervisors who assisted with the management of the practice or had a front-end coordinator; one example is the Husson Family Medicine practice. PSAMF ¶ 129(t); DRPSAMF ¶ 129(t).[83]  Ms. Ashe told Mr. Ako-Annan that

---

factual assertion.  Second, EMMC's other objection is an argument about the significance of the fact and is therefore not a basis to strike the fact.

     EMMC also interposes a qualified response, admitting the factual assertions in PSAMF ¶ 129(r), but denying the fact "to the extent the introductory paragraph 129 implies that this instance" was sex discrimination because "the record citation does not support that" and Mr. Ako-Annan "lacks the requisite personal knowledge."  DRPSAMF ¶ 129(r).  The Court overrules this qualification as argumentative, and unsupported by a record citation.  Pursuant to Local Rule 56(f), the Court deems the facts in PSAMF ¶ 129(r) admitted.  The Court concludes the final clause of PSAMF ¶ 129(r), which reads "indicative of a lack of support by management" is argument by Mr. Ako-Annan's counsel rather than a fact.  The Court declines to include it.

[81]    The Court includes this fact and deems it admitted for the reasons explained in footnote 80.

[82]    EMMC objects that this statement should be stricken because there is no record citation and because it is not evidence of differential treatment on the basis of Mr. Ako-Annan's sex.  DRPSAMF ¶ 129(s).  The Court overrules these objections for two reasons.  First, the factual assertions are supported by Mr. Ako-Annan's reference to his interrogatory responses, PSAMF ¶ 129 (citing *Ako-Annan Interrog. Resp.*).  Second, EMMC's assertions about the significance of the evidence is improper argument, not a factual issue.

     EMMC also interposes a qualified response that admits the factual assertions in PSAMF ¶ 129(s) but clarifies that Mr. Ako-Annan "wanted an administrative assistant, however, no practice managers have administrative assistan[ts]."  DRPSAMF ¶ 129(s) (citing *EMMC Dep.* at 153:19-154:5).  The Court rejects the qualification because on a motion for summary judgment it must construe the facts in the light most favorable to Mr. Ako-Annan and Mr. Ako-Annan's interrogatory responses indicate that he requested a front-end clinical coordinator or an office or clinical supervisor.  PSAMF ¶ 129(s) (citing *Ako-Annan Interrog. Resp.*).

[83]    EMMC objects that PSAMF ¶ 129(t) should be stricken because "the record cited does not support the assertion."  DRPSAMF ¶ 129(t).  EMMC also objects that "[t]o the extent the introductory language in ¶ 129 purports to imply this 'instance' demonstrates differential treatment or standards, that is not supported by the record and should be stricken" because Mr. Ako-Annan "has not demonstrated the requisite personal knowledge to testify as to Ms. Ashe's treatment of the other practice managers or that this 'instance' was based on different standards for his female counterparts or other disparities based on sex."  DRPSAMF ¶ 129(t).  The Court overrules both objections because

he had to make do with a former medical assistant, a licensed practical nurse, who could handle medical issues to a certain extent but had no familiarity or training in the business aspects of the practice.  PSAMF ¶ 129(u); DRPSAMF ¶ 129(u).[84]  In fact, Ms. Ashe admitted to Mr. Ako-Annan that this individual was not qualified at all to be promoted to a supervisor when Mr. Ako-Annan requested that she be promoted.  PSAMF ¶ 129(u); DRPSAMF ¶ 129(u).[85]

Mr. Ako-Annan also had to constantly inform one of the Orono Practice's female providers that she was behind on her patient documentation.  PSAMF ¶ 129(v); DRPSAMF ¶ 129(v).[86]  When Mr. Ako-Annan discussed this with Ms. Ashe,

---

Mr. Ako-Annan cites his interrogatory responses in support of PSAMF ¶ 129(t), *see* PSAMF ¶ 129 n.1, and the interrogatory response supports the factual assertions.  *See Ako-Annan Interrog. Resp.* at 5.

     EMMC also interposes a qualified response that Mr. Ako-Annan wanted to promote S.N. but found out he could not because she lacked the necessary qualifications of being a registered nurse.  DRPSAMF ¶ 129(t).  EMMC also asserts Mr. Ako-Annan "wanted an administrative assistant, but no practice managers have administrative assistan[ts]."  DRPSAMF ¶ 129(t) (citing *EMMC Dep.* at 153:19-154:5).  The Court rejects both qualifications.  At this stage, the Court must construe the record in the light most favorable to Mr. Ako-Annan and Mr. Ako-Annan's interrogatory responses contradict EMMC's responsive factual assertions.

[84]    EMMC objects that PSAMF ¶ 129(u) should be stricken because "the record cited does not support the assertion."  DRPSAMF ¶ 129(u).  EMMC also objects that "[t]o the extent the introductory language in ¶ 129 purports to imply this 'instance' demonstrates differential treatment or standards, that is not supported by the record and should be stricken" because Mr. Ako-Annan "has not demonstrated the requisite personal knowledge to testify as to Ms. Ashe's treatment of the other practice managers or that this 'instance' was based on different standards for his female counterparts or other disparities based on sex."  DRPSAMF ¶ 129(u).  The Court overrules both objections because Mr. Ako-Annan cites his interrogatory responses in support of PSAMF ¶ 129(t), *see* PSAMF ¶ 129 n.1, and the interrogatory response supports the factual assertions.  *See Ako-Annan Interrog. Resp.* at 5.

     EMMC further interposes a qualified response that denies Ms. Ashe told Mr. Ako-Annan he needed to "make do" with S.N. because "the record cited does not support that assertion."  DRPSAMF ¶ 129(u).  The Court rejects the qualification because Mr. Ako-Annan's cited interrogatory response supports the assertion.  *See Ako-Annan Interrog. Resp.* at 5 ("Ms. Ashe told me to make do with a former medical assistant").

[85]    The Court includes this fact for the reasons stated in footnote 84.

[86]    EMMC urges that PSAMF ¶ 129(v) "should be stricken because there is no record citation."  DRPSAMF ¶ 129(v).  The Court overrules this objection because Mr. Ako-Annan cites his interrogatory responses in support of PSAMF ¶ 129(v), *see* PSAMF ¶ 129 n.1, and the interrogatory response supports the factual assertions contained in PSAMF ¶ 129(t).  *See Ako-Annan Dep.* at 5.  EMMC also objects that "[t]o the extent the introductory language in ¶ 129 purports to imply this 'instance' demonstrates differential treatment or standards, that is not supported by the record and should be stricken" because Mr. Ako-Annan "has not demonstrated the requisite personal knowledge to testify

she would tell him that he was correct in his approach.  PSAMF ¶ 129(v); DRPSAMF ¶ 129(v).[87]  However, Mr. Ako-Annan later learned Ms. Ashe was informing the female provider that Mr. Ako-Annan was at fault for enforcing EMMC's system requirements.  PSAMF ¶ 129(v); DRPSAMF ¶ 129(v).[88]

Ms. Ashe would not support Mr. Ako-Annan when he tried to correct staff who were very rude or unprofessional.  PSAMF ¶ 129(w); DRPSAMF ¶ 129(w).[89]  Mr. Ako-Annan and others at the Orono Practice reported a female provider who was very abrupt and who loudly protested after being asked to see a patient who had arrived late to an appointment.  PSAMF ¶ 129(x); DRPSAMF ¶ 129(x).[90]  Despite the

---

as to Ms. Ashe's treatment of the other practice managers or that this 'instance' was based on different standards for his female counterparts or other disparities based on sex."  DRPSAMF ¶ 129(v).  The Court overrules this objection because the assertion is supported by a record citation and because Mr. Ako-Annan has personal knowledge of his relationship with his supervisor, Ms. Ashe.  PSAMF ¶ 129(v).  In DRPSAMF ¶ 129(v), EMMC qualifies PSAMF ¶ 129(t) on largely the same basis and the Court rejects the qualification on the same basis.  The Court deems the fact admitted pursuant to Local Rule 56(f).

[87]   The Court includes this fact for the reasons stated in footnote 86.

[88]   The Court includes this fact for the reasons stated in footnote 86.

[89]   EMMC objects that PSAMF ¶ 129(w) "should be stricken because there is no record citation" and objects to the inclusion of the fact on the same basis.  DRPSAMF ¶ 129(w).  The Court overrules the objection because Mr. Ako-Annan cited his interrogatory responses, which support the assertion.  See PSAMF ¶ 129 n.1 (citing *Ako-Annan Interrog. Resp.*).  In addition, EMMC objects that "[t]he second sentence is also mere speculation and not based on personal knowledge."  DRPSAMF ¶ 129(w).  The Court agrees with EMMC and strikes the second sentence.  Although Mr. Ako-Annan's interrogatory response contains this allegation, *see Ako-Annan Interrog. Resp.* at 5, the allegation is conclusory and is inappropriate to credit on a motion for summary judgment.  *See Mancini*, 909 F.3d at 44 ("It is hornbook law that a plaintiff cannot avoid summary judgment by relying solely on conclusory allegations").

[90]   EMMC objects to PSAMF ¶ 129(x), writing "[t]o the extent the introductory language in ¶ 129 purports to imply this 'instance demonstrates differential treatment or standards that is not supported by the record and should be stricken."  DRPSAMF ¶ 129(x).  EMMC also objects that Mr. Ako-Annan lacks the necessary "personal knowledge to testify as to Ms. Ashe's treatment of the other practice managers or that this 'instance' was based on different standards for his female counterparts or other disparities based on sex."  DRPSAMF ¶ 129(x).  Furthermore, Mr. Ako-Annan says this instance is "irrelevant" because Mr. Ako-Annan and the female provider "are not similarly situated for purposes of disparate treatment."  DRPSAMF ¶ 129(x).  The Court overrules these objections as improper argument.

EMMC also interposes a qualified response that Dr. S, not Ms. Ashe, coached the provider.  DRPSAMF ¶ 129(x) (citing *Ako-Annan Interrog. Resp.* at 5-6).  The Court rejects this qualification

53

documented incident, Ms. Ashe told Mr. Ako-Annan to coach the provider.  PSAMF ¶ 129(x); DRPSAMF ¶ 129(x).[91]  In Mr. Ako-Annan's judgment, the provider should have been subject to a serious oral warning that would be made disclosable to the provider's future employers pursuant to EMMC's internal policy.  PSAMF ¶ 129(y); DRPSAMF ¶ 129(y).[92]

Mr. Ako-Annan's annual performance reviews had to be rescheduled every single time.  PSAMF ¶ 129(z); DRPSAMF ¶ 129(z).[93]  During the performance reviews, Mr. Ako-Annan had to challenge Ms. Ashe for putting inaccurate rating

---

because, after reviewing the interrogatory response in the light most favorable to Mr. Ako-Annan, a reasonable trier of fact could conclude Ms. Ashe told Mr. Ako-Annan to coach the female provider.

[91]    The Court includes this fact for the reasons stated in footnote 90.

[92]    EMMC objects that this statement should be stricken because it appears without a record citation.  DRPSAMF ¶ 129(y).  The Court overrules this objection because Mr. Ako-Annan cited his interrogatory responses in support of PSAMF ¶ 129(y) and the responses support the assertion.  *See* PSAMF ¶ 129 n.1.  EMMC further objects that Mr. Ako-Annan "has not demonstrated the requisite personal knowledge to testify as to how the rules changed compared to other providers or practices" and that this fact "is also irrelevant since the female provider and [Mr. Ako-Annan] are not similarly situated for purposes of disparate treatment evidence."  DRPSAMF ¶ 129(y).  Moreover, EMMC qualifies that Dr. S, not Ms. Ashe, decided that the warning would not be disclosed.  DRPSAMF ¶ 129(y).  The Court accepts these latter objections and strikes the second sentence of PSAMF ¶ 129(y).  Mr. Ako-Annan's claim that "the rules were changed" because the individual disciplined was a female provider is conclusory speculation that the Court may not credit on a motion for summary judgment.  *See Mancini*, 909 F.3d at 44 ("It is hornbook law that a plaintiff cannot avoid summary judgment by relying solely on conclusory allegations").

[93]    EMMC objects that the record citation in PSAMF ¶ 129(z) does not support its factual assertions.  EMMC further objects that "[t]o the extent the introductory language in ¶ 129 purports to imply this 'instance' demonstrates differential treatment or standards, that is not supported by the record and should be stricken.  [Mr. Ako-Annan] has not demonstrated the requisite personal knowledge to testify as to Ms. Ashe's treatment of the other practice managers or that this 'instance' was based on different standards for his female counterparts or other disparities based on sex."  DRPSAMF ¶ 129(z).  The Court overrules both objections.  First, Mr. Ako-Annan cited his interrogatory responses, *see* PSAMF ¶ 129 n.1, and those responses support the assertions contained in PSAMF ¶ 129(z).  *See Ako-Annan Interrog. Resp.* at 6.  Second, EMMC's second objection is improper argument about the significance of Mr. Ako-Annan's factual assertions.

EMMC further interposes a qualified response admitting that Mr. Ako-Annan's 2016 review was rescheduled but noting that the record citation should be stricken as unsupported by the record citation.  DRPSAMF ¶ 129(z).  The Court overrules the qualification and deems the fact admitted under Local Rule 56(f).  As stated, Mr. Ako-Annan cited his interrogatory responses, *see* PSAMF ¶ 129 n.1, and those responses support the assertions contained in PSAMF ¶ 129(z).  The Court accepts that Mr. Ako-Annan has sufficient personal knowledge as to whether certain meetings with his supervisor were rescheduled.

scores on areas where he performed very well.  PSAMF ¶ 129(aa);  DRPSAMF

¶ 129(aa).[94]  Ms. Ashe informed Mr. Ako-Annan that these inaccuracies were the

result of a mistake made by a higher up.  PSAMF ¶ 129(aa); DRPSAMF ¶129(aa).[95]

### P.    Performance Reviews of David Ako-Annan Compared to Other Practice Managers at EMMC

Mr. Ako-Annan received annual performance evaluations each year from 2013

to 2018.  *R.* ¶¶ 12-17.  During Mr. Ako-Annan's first performance review, performed

by Ms. Lavallee in 2013, Mr. Ako-Annan received an overall performance score of

4.25.  PSAMF ¶ 96; DRPSAMF ¶ 96.  Summarizing Mr. Ako-Annan's 360 surveys,

Ms. Lavallee observed:

---

[94]     EMMC objects to the last sentence of PSAMF ¶ 129(aa) sentence as unsupported by a record citation and urges it should be stricken.  DRPSAMF ¶ 129(aa).  The Court overrules the objection.  Mr. Ako-Annan cited his interrogatory response, *see* PSAMF ¶ 129 n.1, and the response includes the assertion.  *See Ako-Annan Interrog. Resp.* at 6.  EMMC further objects that Mr. Ako-Annan "has not demonstrated the requisite personal knowledge to testify as to Ms. Ashe's review of the other female practice managers or that any scoring or change was based on different standards for his female counterparts or other disparities based on sex."  DRPSAMF ¶ 129(aa).  In support of this objection, EMMC notes that Mr. Ako-Annan has said "he never saw any of the other practice manager's evaluations."  DRPSAMF ¶ 129(aa) (citing *Ako-Annan Dep.* at 73:22-24).  EMMC denies this fact for the same reason and notes that Mr. Ako-Annan's "speculation that [Ms.] Ashe evaluated female practice managers was based on rumors and a female practice manager also thought [Ms.] Ashe had favorites."  DRPSAMF ¶ 129(aa) (citing *Ako-Annan Dep.* at 72:25-74:2).  The Court overrules the objection but strikes the fact in response to EMMC's denial in DRPSAMF ¶ 129(a).  Mr. Ako-Annan's statement in his interrogatory response that mistakes in his evaluation were "done to reduce [his] pay increment based on [his] performance, something that never happened to female managers" is a conclusory allegation that the Court may not credit.  *See Mancini*, 909 F.3d at 44 ("It is hornbook law that a plaintiff cannot avoid summary judgment by relying solely on conclusory allegations").  Moreover, the allegation is refuted by Mr. Ako-Annan's own deposition testimony.  *Ako-Annan Dep.* at 73:25-74:2 ("Q. Okay. So you can't say that [Ms.] Ashe had favorites based in the evaluation process, correct?  A.  Based on what we talked, if – yes").  Thus, no reasonable trier of fact could find that his evaluation scores were fraudulently reduced to adversely affect his pay.

The Court deems the remainder of PSAMF ¶ 129(aa) admitted under Local Rule 56(f).  Although EMMC interposes the qualified response that Mr. Ako-Annan "did not agree" with Ms. Ashe's 2016 evaluation of him, *see* DRPSAMF ¶ 129(aa) (citing *Ako-Annan Dep.* at 43:18-25), that assertion is not inconsistent with Mr. Ako-Annan's assertion that Mr. Ako-Annan challenged Ms. Ashe for inaccurate scores "on areas where he performed very well" or Mr. Ako-Annan's assertion that Ms. Ashe told him "it was a mistake made by a higher up."  PSAMF ¶ 129(aa).

[95]     The Court includes this fact for the reasons stated in footnote 94.

> David's most positive results were in the areas of analytical skills, caring
> behaviors and sharing information about the WHY for decisions.  Since
> his hire approximately four months ago, David has brought much
> needed stability and consistency of policy to EMMC Family Medicine
> Orono. One of his greatest strengths is ensure that staff are treated
> fairly.

PSAMF ¶ 97, DRPSAMF ¶ 97.

The following is a summary of Mr. Ako-Annan's employment evaluations and those of other EMMC primary care practice managers, who were all white women. PSAMF ¶ 130; DRPSAMF ¶ 130.  R.W., the Brewer practice manager, had overall scores of 4.45 in 2017 and 4.30 in 2018.  PSAMF ¶ 130(b); DRPSAMF ¶ 130(b).  C.G., the Husson Family Medicine practice manager, had an overall score of 4.45 in 2017. PSAMF ¶ 130(c); DRPSAMF ¶ 130(c).  D.L., the subsequent Husson Family Medicine practice manager had an overall score of 2.70 in 2019, with comments indicating that she struggled with her workload.  PSAMF ¶ 130(d); DRPSAMF ¶ 130(d).  Ms. Ashe noted in her evaluator comments for D.L. in 2019 that the transition to a new electronic medical record (EMR) software and the loss of staff in the practice were factors D.L. had to face.  PSAMF ¶ 130(e); DRPSAMF ¶ 130(e).  M.J., the Hampden Family Medicine practice manager, had overall scores of 4.60 in 2015, 3.50 in 2016, 4.35 in 2017, 4.30 in 2018, and 3.70 in 2019.  PSAMF ¶ 130(f); DRPSAMF ¶ 130. R.S., the practice manager at Cutler Health at the University of Maine in Orono, Maine, had overall scores of 3.0 in 2016, 4.55 in 2017, 2.30 in 2018, and 3.40 in 2019.  PSAMF ¶ 130(g); DRPSAMF ¶ 130(g).

Mr. Ako-Annan's overall performance review scores were 4.20 in 2015, 3.15 in 2016, 4.20 in 2017, and 4.30 in 2018.  PSAMF ¶ 130(a); DRPSAMF ¶ 130(a).  In Ms.

Ashe's first evaluation of Mr. Ako-Annan, there were no significant issues in his performance. PSAMF ¶ 131; DRPSAMF ¶ 131. Ms. Ashe's final performance evaluation of Mr. Ako-Annan before his termination included the following comment:

> David has worked this year to maintain access and increase productivity in his practice. He has demonstrated increased participation via interacting and sharing of ideas in our manager's meetings. He has continued to work with his clinical lead [S.N.] to improve communication and mentor her with leading the clinical staff effectively.

PSAMF ¶ 132. There was nothing in Ms. Ashe's evaluation comments on Mr. Ako-Annan's 2018 evaluation that raised concerns from a human resources perspective. PSAMF ¶ 133; DRPSAMF ¶ 133. For the year 2019, the year in which EMMC terminated Mr. Ako-Annan, Ms. Ashe's own performance score was 2.90, down from a high of 4.45 in 2017. PSAMF ¶ 134; DRPSAMF ¶ 134.

## III.   THE PARTIES' POSITIONS

### A.   EMMC's Motion for Summary Judgment

EMMC moves for summary judgment on the basis of causation. *Def.'s Mot.* at 2. In brief, EMMC contends that "[e]ven viewing the facts in the light most favorable to [Mr. Ako-Annan], . . . [t]here is absolutely no evidence to tie his race, his sex, or his alleged whistleblowing activities to his termination and accordingly, EMMC is entitled to judgment as a matter of law." *Id.*

#### 1.   Count II: The Race and Sex Discrimination Claims

EMMC first urges that it "is entitled to summary judgment on [Mr. Ako-Annan's] race and sex discrimination claims." *Id.* at 9. EMMC says summary judgment is proper because Mr. Ako-Annan cannot state a prima facie case for

employment discrimination and that, even if he could, "EMMC had a legitimate, nondiscriminatory reason for terminating [Mr. Ako-Annan] that was not mere pretext." *Id.* at 9-11.

EMMC argues that Mr. Ako-Annan's prima facie case of employment discrimination is defective for two reasons. *Id.* at 9. First, EMMC asserts Mr. Ako-Annan "cannot demonstrate" that "he met his employer's expectations." *Id.* Second, EMMC argues that Mr. Ako-Annan presented no evidence that "similarly-situated employees outside the protected class received more favorable treatment." *Id.* at 10.

Even if Mr. Ako-Annan presented a prima facie case of employment discrimination, EMMC insists that its reasons for terminating Mr. Ako-Annan were not a pretext for race and sex discrimination. *Id.* at 11. EMMC emphasizes that it received "complaints from Orono staff and medical providers and [Mr. Ako-Annan's] blatant insubordination to Worster." *Id.* EMMC says Mr. Ako-Annan's "termination was based on the staff and provider complaints about his management of the Orono practice and because he could not move the Orono practice forward." *Id.* EMMC further stresses that Mr. Ako-Annan's claims of racial and gender discrimination "are both based on alleged discriminatory animus of [his] supervisor, Donna Ashe." *Id.* EMMC urges that even if Ms. Ashe's conduct was discriminatory, "it was Worster, not Ashe, who made the termination decision." *Id.*

EMMC disputes that Ms. Ashe's statements constitute discriminatory animus. EMMC notes that Mr. Ako-Annan "was always a racial minority and he was always a male" and that he conceded "he got along well with Ashe for the first year and a

half they worked together." *Id.* at 12.  It asserts that Ms. Ashe's statement that she had a Black foster child is "wholly insufficient" to show discriminatory animus. *Id.* According to EMMC, Ms. Ashe's statement "may have been insensitive," but "it is not blatantly racist and there is no connection between her comment and the decision to terminate [Mr. Ako-Annan] years later for the failure to effectively manage the Orono office after receiving and investigating multiple complaints from staff and providers." *Id.* at 12-13.

EMMC also contends Mr. Ako-Annan cannot establish sex discrimination caused his termination. *Id.* at 13.  It urges that Mr. Ako-Annan's only admissible evidence of sex discrimination is that "he was the only male Practice Manager at EMMC." *Id.*  EMMC asserts that Mr. Ako-Annan's implication that his termination was "necessarily discriminatory" and "pretextual" "proves too much" because Mr. Ako-Annan "cannot connect the composition of other practice managers to EMMC's decision to terminate" Mr. Ako-Annan. *Id.* at 13-14.  EMMC concludes that "[b]ecause [Mr. Ako-Annan] cannot demonstrate that unlawful discrimination caused his termination or that EMMC's reason was pretextual, his race and sex discrimination claims fail." *Id.* at 14.

### 2.    Count III: The Maine Whistleblower Protection Act Claims

EMMC also argues that the Court should enter summary judgment in its favor on Mr. Ako-Annan's claims under the Maine Whistleblower Protection Act, 26 M.R.S. § 833, et seq. (MWPA). *Id.*  EMMC says that Mr. Ako-Annan's "[M]WPA claim cannot survive summary judgment" because he failed to establish two elements of the prima

facie case: (1) that he engaged in a protected activity and (2) that his protected activity caused an adverse employment decision.  *Id.*

EMMC submits that Mr. Ako-Annan did not engage in protected activity under the MWPA.  *Id.* at 15.  First, it argues that although Mr. Ako-Annan claims he reported Fair Medical Leave Act (FMLA) fraud, this was not protected activity because "he was not opposing illegal acts on the part of his employer, but rather . . . was frustrated that some of his employees received doctor's notes . . . permitting them to be absent from work."  *Id.*  Moreover, due to a more than one-year lapse in time between Mr. Ako-Annan reporting his FMLA fraud concerns to Ms. Ashe and his eventual firing, EMMC says that "there is no evidence in this record upon which a reasonable juror could find the requisite causal link between" Mr. Ako-Annan reporting the suspected fraud and his eventual termination.  *Id.* at 16.

Second, EMMC argues that Mr. Ako-Annan's reporting of alleged overprescribing of opioids at the Orono practice was not a protected activity under the MWPA.  *Id.*  It contends that Mr. Ako-Annan "had absolutely no personal knowledge that Dr. R. was overprescribing opioids" but merely "pass[ed] on to [Ms.] Ashe what he had been told by one of Dr. R.'s former medical assistants."  *Id.*  EMMC points out that the allegation about Dr. R. concerned his previous employer and "it is undisputed that while he was at EMMC . . . Dr. R. has never been flagged" for overprescribing opiates.  *Id.* at 17.  EMMC submits that the lapse of time between when Mr. Ako-Annan voiced his concerns about Dr. R overprescribing opioids and Mr. Ako-Annan's termination does not support an inference of causation.  *Id.*

### B.    David Ako-Annan's Opposition

#### 1.    Count II: Race and Sex Discrimination

Mr. Ako-Annan argues that he made a prima facie case of race and sex discrimination.  *Pl.'s Opp'n* at 6.  According to Mr. Ako-Annan, EMMC does not "seriously challenge" his claim of disparate treatment because a prima facie case of employment discrimination does not require "that the plaintiff show that the [plaintiff's position] was filled by a person not possessing the protected attribute" but instead requires "proof that 'the employer had a continued need for someone to perform the same work after the complainant left.'"  *Id.* at 7 n.5 (quoting *Cumpiano v. Banco Santander P.R.*, 902 F.2d 148, 153, 155 (1st Cir. 1990)).

Mr. Ako-Annan also insists that he "was qualified for the position of Practice Manager as demonstrated by his MBA in Healthcare Management and his Master's Degree in Human Relations Counseling."  *Id.* at 7.  He highlights his positive performance reviews and says "[t]here was nothing in Ms. Ashe's evaluation comments in [his] last performance review in 2018 that raised any concerns."  *Id.*  Mr. Ako-Annan therefore concludes that when the evidence is viewed in the light most favorable to him, it "demonstrates that any difficulties he experienced in maintaining staff morale in his office in 2019 were due to systemic issues and lack of support from upper management."  *Id.* at 7-8.  "More importantly," he claims "the evidence demonstrates that his supervisor, Ms. Ashe, a person with demonstrable racial antagonism toward Mr. Ako-Annan, undermined Mr. Ako-Annan's authority in the

practice in a variety of ways which contributed to the difficulties within the Orono practice." *Id.* at 8.

Mr. Ako-Annan concedes that EMMC had facially legitimate non-discriminatory grounds to terminate his employment. *Id.* However, he argues there are genuine issues of material fact as to whether those reasons were a pretext for intentional discrimination. *Id.* Specifically, he points to "six recognized indicia of illegal discrimination." *Id.*

First, citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000), Mr. Ako-Annan claims that "[r]ejection of the employer's proffered reason for terminating an employee permits an inference of discriminatory conduct." *Id.* Here, Mr. Ako-Annan claims that despite the allegations of his "blatant insubordination to Worster" and "complaints from staff and providers in Orono," other record evidence suggests that these reasons were not the true basis for his termination. *Id.* at 9. Mr. Ako-Annan points to the statements of Sonya Michaud and S.N., who both spoke positively of Mr. Ako-Annan. *Id.* He highlights that "Ms. Michaud perceived that Ms. Ashe was unprofessional because she was condescending and showed favoritism to certain Orono employees." *Id.* Moreover, he notes that Ms. Michaud and S.N. believed "it was an extensive backlog . . . [and] absenteeism and the failure of the team to work together" at the Orono practice that was causing the difficulties, rather than Mr. Ako-Annan's actions. *Id.* He also observes "Dr. R2, a longtime provider in Orono, informed Ms. Ashe that Mr. Ako-Annan was being a good [soldier] and that

the real problems in the practice were due to mismanagement at the upper levels of EMMC." *Id.* at 9-10.

Mr. Ako-Annan draws the Court's attention to "record evidence that race and sex based animus permeated the relationship between [himself] and Ms. Ashe." *Id.* at 10. He notes that "during a performance review, [Ms. Ashe] suggested "that Mr. Ako-Annan should look for work elsewhere in the organization" and that "[w]hen Mr. Ako-Annan questioned her, [she] commented that she could not be racist because she had a black foster child." *Id.* Furthermore, he highlights that Ms. Ashe "informed her supervisor that Mr. Ako-Annan had raised the subject of 'diversity' in Orono which was becoming 'uncomfortable' to her" and that "Mr. Ako-Annan submitted a direct claim of discrimination to Mr. Reid about Ms. Ashe in 2016." *Id.*

Mr. Ako-Annan also submits that he "faced similar, racially offensive remarks from Ms. Ashe during the May 22, 2017 meeting when he raised concerns of disparate treatment between himself and other women practice managers." *Id.* He states that he "immediately submitted a complaint of race discrimination to EMMC" and that Ms. Ashe was not disciplined despite making a comment EMMC regarded as "inappropriate." *Id.* He also points out that he "was subjected to written [counseling] for the manner in which he voiced his discrimination concern to Ms. Ashe." *Id.* Thus, Mr. Ako-Annan says "[a] jury could conclude that Ms. Ashe, motivated by race and gender bias toward Mr. Ako-Annan, fostered a deteriorating atmosphere to challenge Mr. Ako-Annan's ability to lead the practice" and therefore find that "prohibited factors were the actual motivating reasons" for his termination. *Id.* at 10-11.

As a second ground for a finding of race and sex discrimination, Mr. Ako-Annan says that the historical lack of racial minorities at the Orono Practice, "when coupled with other evidence of pretext may permit a reasonable jury to find that" he "was the victim of discrimination based on one or more minority characteristics." *Id.* at 11 (quotation omitted). Here, Mr. Ako-Annan notes that "[t]he EMMC Primary Practices were not a diverse workplace and there were no efforts to improve diversity in Orono during Donna Ashe's tenure." *Id.*

Mr. Ako-Annan argues there is "evidence of implicit bias and stereotypes" against him. *Id.* He says that "[a]n inference of prohibited stereotypical thinking is raised by the fact that [he] was the only black male practice manager and he was the only black male in the Orono practice." *Id.* Mr. Ako-Annan claims there is a risk of "stereotypical thinking . . . whenever there is a single employee in a protected class who is under evaluation." *Id.* at 12 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235-36 (1989)).

Mr. Ako-Annan submits that the record "amply support[s]" that "EMMC may be tone deaf toward concerns of racism and sexism." *Id.* at 13. He emphasizes that he was the interim manager of the Husson Family Practice, but that Ms. Ashe did not consider him for the full-time position. *Id.* In addition, he claims he submitted three claims of race discrimination to EMMC in 2013, 2016, and 2017, "but there is no evidence of any significant action by EMMC." *Id.* Instead, Mr. Ako-Annan says he "was criticized by Ms. Ashe for raising diversity concerns during his 2016 performance evaluation." *Id.* Furthermore, Mr. Ako-Annan says Ms. Ashe's

comments that he "was not a good fit in the [Orono] practice and that he might consider looking for work elsewhere in the organization" is "an indicator of implicit bias." *Id.* He also faults EMMC for censuring him "for raising his voice to express his frustration over what he perceived to be a dual standard of treatment and Ms. Ashe's remark that she had a Black" foster child. *Id.* He says that despite investigating Mr. Ako-Annan's 2017 complaint, EMMC "was not aware that one of the few other people of color left the Orono practice in 2017 due to her own concerns of racism" and that "EMMC did not conduct any inquiry as to why Ms. Ashe was hiring only white female practice managers." *Id.*

Mr. Ako-Annan asserts that his meeting with Mr. Reid and Ms. Ashe further corroborates his claim that EMMC was implicitly biased against his race. *Id.* He flags that Mr. Reid told him "the importance of showing his supervisor respect & to always behave in a professional manner" and says that "[i]n the context of race relations in American history, this comment is reminiscent of the command to obey the plantation master regardless of any perceived injustice." *Id.* On the whole Mr. Ako-Annan urges that "EMMC conveyed the message . . . that he should not get out of place by raising concerns of lack of diversity, and race and sex based double standards." *Id.* at 13-14.

In addition, Mr. Ako-Annan disputes EMMC's assertion that he was "insubordinate when he refused to name names to support his contention that he raised in the April 3 meeting with Ms. Worster and Ms. Ashe."[96] *Id.* at 14. He claims

---

[96] The Court suspects Mr. Ako-Annan is referring to the April 2, 2019 meeting among Mr. Ako-Annan, Ms. Ashe, and Ms. Worster.

this assertion is "indicative of implicit racial bias as well" because "EMMC H.R. was aware or should have been aware that [he] had raised concerns of race and/or sex discrimination in 2013, 2016 and 2017 but each of those instances proved to be wanting . . . and he was sanctioned for raising his concerns of discrimination in 2017 because he was too loud." *Id.* He emphasizes that "[i]t never occurred to EMMC's H.R. that a black man who had been through three prior instances of discrimination and who had been sanctioned in the most recent instance might decline to name names, reflecting an attitude that is highly insensitive to a minority." *Id.*

Mr. Ako-Annan's fourth claim that his termination was pretextual concerns the comments made by Ms. Ashe. *Id.* He says "Ms. Ashe's racial hostility is demonstrated by . . . two actions." *Id.* at 14-15. First, he notes that "she disavow[ed] racism because she has a Black foster child" and second, "she complain[ed] to her supervisor that Mr. Ako[-]Annan raised the issue of 'diversity,' a topic that made her feel 'uncomfortable.'" *Id.* at 15. Because of Ms. Ashe's involvement in the investigation of Mr. Ako-Annan in 2019, Mr. Ako-Annan says "her statements are more probative of racial animus than mere 'stray remarks.'" *Id.* at 15. Rather, he says that as "the lead investigator in 2019" a jury may find a causal nexus between Ms. Ashe's remarks and EMMC's ultimate decision to terminate Mr. Ako-Annan. *Id.*

Fifth, Mr. Ako-Annan claims his termination was pretextual because Ms. Ashe demonstrated hostility toward him and worked to undermine him. *Id.* Mr. Ako-Annan says that "the record demonstrates that Ms. Ashe was setting [him] up for failure and applying different standards to him." *Id.* at 16. He observes that Ms.

Ashe "rebuffed Mr. Ako-Annan's requests for additional support and medical staff," "diverted essential Orono staff to other practices without informing Mr. Ako-Annan which added to the workload of the remaining staff, requiring seven days a week efforts with little reduction in backlog," and exclusively hired white women to fill practice manager positions. *Id.* at 16-17.

Sixth, Mr. Ako-Annan urges the reasons for his termination were pretextual because of evidence that "his alleged performance issues are due to factors beyond [his] control." *Id.* at 17. He says "[a] jury might find it to be discriminatory to hold Mr. Ako-Annan solely accountable for the systemic failures at EMMC affecting all the primary care practices." *Id.* He notes that EMMC's human resources department had heard of insufficient staffing at several of its locations, and Ms. Ashe confirmed Mr. Ako-Annan "expressed his view that he was not getting sufficient support from upper management on various matters." *Id.* Mr. Ako-Annan also points out that EMMC recognized "that chronic understaffing was detrimental to morale" but was nevertheless asking practice managers "to meet national revenue goals" and "implement new electronic medical records and document management systems which created additional staff pressures." *Id.*

### 2.    Count III: The Maine Whistleblower Protection Act Claims

Mr. Ako-Annan argues his MWPA claim should survive summary judgment. *Id.* at 18-20. He says that he engaged in MWPA protected activities by reporting Dr. R to Ms. Ashe for FMLA fraud and overprescribing opioids. *Id.* at 18. Mr. Ako-Annan also contends three pieces of evidence establish causation for his MWPA claim. *Id.*

at 20.  First, he argues "Dr. R was aware that Mr. Ako-Annan had raised the FMLA fraud and opioid prescription issues." *Id.*  Second, he notes that "[o]n March 29, 2019, Dr. R. expressed to Donna Ashe his disappointment that it appeared Mr. Ako-Annan would remain in his position as practice manager after Ms. Ashe's investigation." *Id.* Third, he claims "Ms. Ashe apparently informed Ms. Worster of Dr. R's position regarding Mr. Ako-Annan." *Id.*  Mr. Ako-Annan points out that EMMC informed him of his termination two days after Ms. Ashe relayed this information to Ms. Worster. *Id.*  Therefore, he says "a jury may infer that Dr. R. made his recommendation that Mr. Ako Annan be removed from the Orono practice to retaliate against Mr. Ako-Annan's protected conduct concerning Dr. R." *Id.*

### C.   EMMC's Reply

EMMC concludes Mr. Ako-Annan "is left with a record that establishes little more than that he was the only practice manager who was Black and male and that he was terminated." *Def.'s Reply* at 1.  EMMC submits that these facts "are simply insufficient to create a question of material fact as to whether [Mr. Ako-Annan's] protected status motivated EMMC's decision to terminate his employment." *Id.* Furthermore, EMMC characterizes the MWPA claim as "even thinner" because it is rooted in "a single email that Dr. R sent to [Ms.] Ashe expressing his frustration that [Mr. Ako-Annan] was still employed."  *Id.*  As EMMC stresses however, Mr. Ako-Annan offered "no evidence to tie that email into [Ms.] Worster's decision to terminate him." *Id.*

EMMC criticizes Mr. Ako-Annan's attempt to place blame for his termination on Ms. Ashe by "claiming that she was motivated by racial and/or sex animus and that she was the ultimate engineer of his termination, either by making the job more difficult for him or by participating in the investigation of complaints made by his employees." *Id.* at 5. EMMC says "it appears that [Mr. Ako-Annan] is proceeding under a cat's paw analysis which would require that he show: (1) that his supervisor exhibited discriminatory animus; and (2) that the final decision maker – Ms. Worster – acted as the conduit of the supervisor's prejudice." *Id.* EMMC contends that Mr. Ako-Annan "has failed to bear that burden under either prong." *Id.*

EMMC also argues Mr. Ako-Annan cannot "show that [Ms.] Ashe's adverse treatment of him was due to his race or sex." *Id.* It submits that most of the proffered facts supporting this assertion are inadmissible and observes that "[a]lthough [Mr. Ako-Annan] faults [Ms.] Ashe for failing to give him sufficient resources to be successful, he acknowledges that most other practices were similarly strapped." *Id.* at 6. Moreover, EMMC observes that Ms. Worster's decision to terminate Mr. Ako-Annan was rooted not only in Ms. Ashe's investigation into Mr. Ako-Annan, but also from Mr. Zelz's investigation and oral report. *Id.* In addition, EMMC notes that Ms. Worster terminated Mr. Ako-Annan after he failed "to provide her with the information she requested or any potentially mitigating information related to the complaints." *Id.* EMMC argues that "[t]here is no record evidence that [Ms.] Worster's directive to [Mr. Ako-Annan] at the meeting on April 2, 2019 was somehow

influenced or orchestrated by [Ms.] Ashe or [Ms.] Worster was otherwise just a rubber stamp for [Ms. Ashe]." *Id.*

Finally, EMMC addresses Ms. Ashe's statement that she had a Black foster child and her "complaint to Michael Reid that [Mr. Ako-Annan] brought up diversity during his evaluation." *Id.* at 7. EMMC acknowledges that "[t]hese comments, although perhaps insensitive, are not discriminatory." *Id.* Moreover, EMMC says that Mr. Ako-Annan "can show no connection whatsoever – temporal or contextual – between comments [Ms.] Ashe made in 2017 and [Ms.] Worster's decision to terminate him in 2019." *Id.*

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)).

The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)).  Then, a court "views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).  "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## V.    DISCUSSION

EMMC moves for summary judgment on Mr. Ako-Annan's claims under Title VII the Maine Whistleblower Protection Act (MWPA).  The Court denies the motion because genuine issues of material fact preclude summary judgment.

### A.    The Title VII Claims: Race and Sex Discrimination

Mr. Ako-Annan claims EMMC fired him because of race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. *Compl.* ¶¶ 21-23.  In relevant part, Title VII provides:

> **(a) Employer Practices.**  It shall be an unlawful employment practice for an employer—

71

**(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(a)(1). Section 2000e-2(a)(1) "prohibit[s] all discriminatory practices in whatever form which create inequality in employment opportunity, reaching beyond conscious racism to root out stereotyped thinking and other forms of less conscious bias in employment decisions." *Brandt v. Fitzpatrick*, 957 F.3d 67, 75 (1st Cir. 2020) (citing *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 42, 58-61 (1st Cir. 1999)) (internal quotation marks omitted).

In Title VII parlance, Mr. Ako-Annan brings a "disparate treatment" claim. *Cumpiano v. Banco Santander de P.R.*, 902 F.2d 148, 156 (1st Cir. 1990). Such a claim "arises when an employer treats an employee less favorably than others because of [the employee's] race, color, religion, sex, or national origin." *Id.* Because Mr. Ako-Annan "does not allege there is evidence of direct discrimination, [the Court must] apply the familiar three-step, burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for allegations of circumstantial evidence of discrimination." *Taite v. Bridgewater State Univ. Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021).

A *McDonnell Douglas* analysis has three steps. *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 113 (1st Cir. 2015). First, a Title VII plaintiff must establish a prima facie case of employment discrimination. *Id.* at 113. The prima facie case is "a small showing that is not onerous and is easily made." *Kosereis v. Rhode Island*, 331

F.3d 207, 213 (1st Cir. 2003) (internal citations and quotation marks omitted). Although a Title VII plaintiff's prima facie case may differ depending on the facts, it generally requires that a plaintiff show "(1) he is a member of a protected class; (2) he was qualified for the job; (3) the employer took an adverse employment action against him; and (4) the position remained open or was filled by a person with similar qualifications."[97] *Cham v. Station Operators, Inc.*, 685 F.3d 87, 93 (1st Cir. 2012) (quoting *Kosereis*, 331 F.3d at 212-13); *McDonnell Douglas*, 411 U.S. at 802 n.13 ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect to differing factual situations").

When a Title VII plaintiff makes a prima facie case of employment discrimination, "the burden of production shifts to the defendant to produce evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." *Cham*, 685 F.3d at 94 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)) (internal quotation marks omitted). "This burden is one of production,

---

[97] Mr. Ako-Annan's opposition brief takes issue with EMMC's formulation of the Title VII prima facie case. *Pl.'s Opp'n* at 7 n.5. EMMC draws its legal standard from *Prescott v. Higgins*, 538 F.3d 32, 41 (1st Cir. 2008) and *Fontánez-Nuñez v. Janssen Ortho LLC*, 447 F.3d 50, 55 (1st Cir. 2006). *Def.'s Mot.* at 9. Mr. Ako-Annan is most concerned with EMMC's formulation of the fourth element and insists "the First Circuit has held that it is not necessary that the plaintiff show that the person hired was filled by a person not possessing the protected attribute." *Pl.'s Opp'n* at 7 n.5. Instead, he says, "the 'fourth prong' may be established with proof that 'the employer had a continued need for someone to perform the same work after the complainant left.'" *Id.* (quoting *Cumpiano*, 902 F.3d at 155).

    The parties are talking past one another, although their confusion is somewhat understandable. *Prescott* states two different prima facie cases for Title VII disparate treatment claims. *See Prescott*, 538 F.3d at 40-41. EMMC cited the elements that appear on page 41, which applies to discrimination in compensation; however, Mr. Ako-Annan faults EMMC's brief for allegedly misstating the legal standard on page 40, which applies to claims of discrimination in hiring and firing decisions. Although the legal standard on page 40 is more applicable to this case, the Court rejects Mr. Ako-Annan's implication that EMMC filed a misleading statement of law.

not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 509).

If a defendant produces legitimate, non-discriminatory reasons for the plaintiff's termination, the *McDonnell Douglas* inquiry continues to step three. *Theidon v. Harvard Univ.*, 948 F.3d 477, 495 (1st Cir. 2020). At step three, "the *McDonnell Douglas* framework 'disappears' and the sole remaining issue is 'discrimination *vel non*.'" *Ray*, 799 F.3d at 113 (quoting *Cham*, 685 F.3d at 93). "[T]he burden of production shifts back to [the plaintiff] to show by a preponderance of the evidence . . . that [the employer's] articulated reason for [the adverse employment action] is pretextual and that the actual reason is discriminatory." *Taite*, 999 F.3d at 94 (internal citation omitted).

### 1.     Prima Facie Case

EMMC urges the Court to grant its motion for summary judgment because Mr. Ako-Annan has not made a prima facie showing that he "met [EMMC's] expectations" and that "similarly-situated employees received more favorable treatment." *Def.'s Mot.* at 1-2. The Court rejects EMMC's arguments as without merit.

### a.     Whether David Ako-Annan was Qualified

Mr. Ako-Annan made a prima facie showing that he was qualified for the position of practice manager. "The issue of job qualifications must be viewed in an objectively reasonable way." *Cumpiano*, 902 F.2d at 154. In a discharge case like this, "the employer 'has already expressed a belief that [the plaintiff] is minimally

qualified,' by previously 'hiring the employee.'" *Caraballo-Caraballo v. Corr. Admin. de P.R.*, 892 F.3d 53, 59 (1st Cir. 2018) (quoting *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) (alteration in *Caraballo-Caraballo*)). Thus, "courts will rarely need to compare the plaintiff's credentials with the employer's stated job requirements." *Id.* at 59-60. Instead, "the plaintiff's ability to satisfy the job qualifications element will ordinarily depend on whether [the plaintiff] was successfully performing [the] job at the time of [the] discharge or transfer, such that [the plaintiff] did not disqualify [themself] by performing poorly." *Id.* at 60 (citing *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 139 (1st Cir. 2012)).

Mr. Ako-Annan satisfies his prima facie burden by pointing to several facts. First, he notes that he has an MBA in Healthcare Management and a master's degree in Human Relations Counseling. *Pl.'s Opp'n* at 7; *see also* PSAMF ¶ 94; DRPSAMF ¶ 94. Second, he notes that he held the position of practice manager at the Orono Practice from 2013 to 2019. *Pl.'s Opp'n* at 7; *R.* ¶¶ 3, 22. Third, Mr. Ako-Annan highlights his positive performance reviews from his first supervisor, Ms. Lavallee, and later from Ms. Ashe. *Pl.'s Opp'n* at 7. He observes that his "performance scores on a scale of 1 to 5 under Donna Ashe's tenure were 4.20 in 2015; 3.15 in 2016; 4.20 in 2017 and 4.30 in 2018." *Pl.'s Opp'n* at 7 (citing PSAMF ¶ 130(a)). Furthermore, Mr. Ako-Annan reminds the Court that "[t]here was nothing in Ms. Ashe's evaluation comments in Mr. Ako-Annan's last performance review in 2018 that raised any concerns." *Id.* (citing PSAMF ¶ 133). The Court further observes the Orono Practice had satisfactory financial performance during Mr. Ako-Annan's tenure as practice

manager.  PSAMF ¶ 157; DRPSAMF ¶ 157; PSAMF ¶ 159; DRPSAMF ¶ 159.  Thus, Mr. Ako-Annan made a prima facie showing he was qualified for the practice manager position.

EMMC resists the Court's conclusion because "[t]he record demonstrates that [Mr. Ako-Annan's] performance fell short of expectations in regard to his ability to manage his staff and maintain positive morale in the practice."  *Def.'s Mot.* at 9.  The Court rejects EMMC's argument because it runs contrary to binding precedent. "[T]he Court 'cannot consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case.'" *Putnam v. Reg'l Sch. Unit 50*, No. 1:14-cv-00154-JAW, 2015 U.S. Dist. LEXIS 122458, at *100 (D. Me. Sept. 15, 2015) (quoting *Melendez v. Autogermana, Inc.*, 622 F.3d 46, 51 (1st Cir. 2010)); [98] *Vélez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 448 (1st Cir. 2009) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc)).  Therefore, despite EMMC's claims about Mr. Ako-Annan's job performance, he met his prima facie burden to show he was qualified.

> **b.**     **Whether EMMC Had A Continued Need for Someone to Perform the Same Work as David Ako-Annan Following His Termination or Hired Someone Outside the Protected Group**

When a Title VII plaintiff alleges wrongful termination on the basis of a protected characteristic, the plaintiff "can make out the fourth element of [the] prima facie case without proving that [the] job was filled by a person not possessing the

---

[98]     The Court observes EMMC's counsel was defense counsel in *Putnam* and made the same prima facie case argument that she advances here.  Then, as now, *Melendez* very clearly foreclosed the argument.

protected attribute." *Cumpiano*, 902 F.2d at 155.  Instead, a plaintiff may satisfy the fourth element of the Title VII prima facie case "*either* by showing that the position was filled by someone outside the protected group or that the employer had a continued need for someone to perform the same work after [the plaintiff] left." *Bina v. Providence Coll.*, 39 F.3d 21, 24-25 (1st Cir. 1994) (emphasis in original) (internal citation and quotation marks omitted).

EMMC argues that summary judgment is proper because Mr. Ako-Annan "cannot establish that similarly situated employees received more favorable treatment" or that "similarly-situated white employees received more favorable treatment." *Def.'s Mot.* at 10.  The Court disagrees.  As just explained, Mr. Ako-Annan has no burden to demonstrate disparate treatment during the course of his employment.  Instead, the issue is whether Mr. Ako-Annan showed his "position was filled by someone outside the protected group or that [EMMC] had a continued need for someone to perform the same work after [Mr. Ako-Annan] left." *Bina*, 39 F.3d at 24-25.

Mr. Ako-Annan easily met this burden.  He writes: "With respect to the fourth element, Mr. Ako-Annan was replaced by R.S., a white female.  In contrast to Mr. Ako-Annan's performance score of 4.30 in 2018, R.S[.]'s score for that year was 2.30." *Pl.'s Opp'n* at 7 n.6 (citing PSAMF ¶ 130(g)).  R.S. is neither male nor Black and therefore lacks the protected attributes that Mr. Ako-Annan possesses.  PSAMF ¶¶ 81-82 (noting Mr. Ako-Annan was the only male and only non-white EMMC

primary care practice manager in the greater Bangor area).  Thus, Mr. Ako-Annan made a prima facie case of employment discrimination.

### 2.   Non-Discriminatory Justification

Mr. Ako-Annan "does not contest that EMMC has asserted reasons which, on their face, purport to be legitimate, non-discriminatory reasons for his termination." *Pl.'s Opp'n* at 8.  The Court agrees.  The undisputed record shows EMMC had knowledge of numerous complaints about Mr. Ako-Annan's poor leadership, communication, and inability to manage the Orono Practice without incident.  The record also contains evidence that Ms. Worster terminated Mr. Ako-Annan after he did not comply with her order to provide corroborating evidence of his race and sex discrimination claims and because she did not believe Mr. Ako-Annan could move the Orono Practice forward.  Accordingly, the Court concludes EMMC met its burden of producing legitimate, non-discriminatory reasons for Mr. Ako-Annan's termination.

### 3.   Pretext

The Court must next determine whether Mr. Ako-Annan "produce[d] evidence creating a genuine issue of fact as to whether: (1) [EMMC's] articulated reason for his termination was pretextual and (2) racial [and sex] discrimination was the real reason for his termination." *Joseph v. Lincare*, 989 F.3d 147, 158 (1st Cir. 2021).  The Court must "look at evidence of discrimination not in splendid isolation, but as part of an aggregate package of proof offered by the plaintiff." *Mesnick v. Gen. Electric Co.*, 950 F.2d 816, 824 (1st Cir. 1991).  Mr. Ako-Annan may "use the same evidence to support both conclusions, provided that the evidence is adequate to enable a

rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000) (quoting *Thomas*, 183 F.3d at 57).

When considering pretext "a court's focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." *Vélez*, 585 F.3d at 452 (quoting *Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 246 (1st Cir. 2006)). However, under the so-called "cat's paw" theory of liability, "corporate liability can attach when a neutral decisionmaker 'rel[ies] on information that is manipulated by another employee who harbors illegitimate animus.'" *Ameen v. Amphenol Printed Cirs., Inc.*, 777 F.3d 63, 70 (1st Cir. 2015) (quoting *Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77, 86-87 (1st Cir. 2004)) (alteration in *Ameen*). "Cat's paw" liability requires a plaintiff to "produce evidence that: (1) a non-decisionmaker motivated by a [discriminatory] animus committed an act intending to cause an adverse employment action; and (2) such act caused an adverse action." *McLean v. Delhaize Am. Distrib., LLC*, No. 2:18-cv-00152-GZS, 2019 U.S. Dist. LEXIS 145464, at *13 (D. Me. Aug. 27, 2019) (citing *Ameen*, 777 F.3d at 70-71).

Mr. Ako-Annan offered no evidence that the final decision maker, Ms. Worster, fired him because of his race or sex. Thus, without expressly invoking the theory, Mr. Ako-Annan must be urging the Court to apply "cat's paw" liability. To prevail, Mr. Ako-Annan must submit evidence upon which a jury could reasonably conclude (1) that Ms. Ashe exhibited discriminatory animus; and, (2) the final decisionmaker, Ms.

Worster, was a conduit for Ms. Ashe's prejudice. *Harlow v. Potter*, 353 F. Supp. 2d 109, 115 (D. Me. 2005); *Ameen*, 777 F.3d at 70-71.

### a.   Donna Ashe's Discriminatory Animus

Viewing the record in the light most favorable to Mr. Ako-Annan and drawing all reasonable inferences in his favor, there are a genuine disputes of material fact as to whether Ms. Ashe exhibited discriminatory animus toward Mr. Ako-Annan based on his race and sex.  In his opposition to EMMC's motion for summary judgment, Mr. Ako-Annan points to several actions by Ms. Ashe that could support findings she engaged in racial discrimination, sex discrimination, or both. *Pl.'s Opp'n* at 8-18.

First, Mr. Ako-Annan highlights evidence that Orono Practice and EMMC were not diverse workplaces. *Id.* at 11.  Supreme Court precedent establishes that "statistics as to [an employer's] employment policy and practice may be helpful to a determination of whether" the employer's conduct "conformed to a general pattern of discrimination against" a particular protected group. *McDonnell Douglas*, 411 U.S. at 805.  The First Circuit has similarly stressed that "a history of hiring and promotions that entirely excluded" certain protected groups "can be significant in assessing discriminatory animus." *Ahmed v. Johnson*, 752 F.3d 490, 503 (1st Cir. 2014).

The statistics favor Mr. Ako-Annan.  He was EMMC's only male, only Black, and only non-white primary care practice manager in the Bangor area during Ms. Ashe's tenure.  PSAMF ¶¶ 81-82; DRPSAMF ¶¶ 81-82.  Ms. Ashe was responsible for hiring the primary care practice managers and only hired white women on the three

occasions in which vacancies arose. PSAMF ¶¶ 88-89; DRPSAMF ¶¶ 88-89. Moreover, while the Orono Practice had eighty-four employees, Mr. Ako-Annan was one of only ten males. PSAMF ¶ 75; DRPSAMF ¶ 75. He was also the only Black employee at the Orono Practice, and one of only four people of color who worked there. PSAMF ¶¶ 76-77; DRPSAMF ¶¶ 76-77. During Ms. Ashe's tenure, EMMC made no efforts to improve diversity within the Orono Practice, despite Mr. Ako-Annan repeatedly raising EMMC's lack of diversity to her. PSAMF ¶ 80; DRPSAMF ¶ 80; PSAMF ¶ 83; DRPSAMF ¶ 83.

Taken alongside Mr. Ako-Annan's other evidentiary proffers, a jury could reasonably view Ms. Ashe's decision to hire only white women as practice managers as evidence that she harbored race and sex-based animus toward Mr. Ako-Annan. As Ms. Ashe did not herself hire Mr. Ako-Annan, her practice manager hiring decisions could show a potential pattern, albeit with a very small sample size, of excluding non-white and non-male applicants. Under *McDonnell Douglas* and *Ahmed*, this is probative of discriminatory animus. At the same time, however, the Court is not convinced that Mr. Ako-Annan's claims about the lack of diversity at the Orono Practice could support a jury finding that Ms. Ashe or EMMC acted with discriminatory animus. The undisputed facts reflect that Mr. Ako-Annan was himself responsible for hiring decisions at the Orono Practice. *R.* ¶ 6.

As Mr. Ako-Annan rightly observes, the lack of diversity at the Orono Practice is relevant for a different reason. *Pl.'s Opp'n* at 11-14. "The Supreme Court has long recognized that unlawful discrimination can stem from stereotypes and other types

of cognitive biases, as well as from unconscious animus." *Thomas*, 183 F.3d at 59. First Circuit precedent confirms that "the tendency of 'unique' employees (that is, single employees belonging to a protected class, such as a single female or single minority in the pool of employees) to be evaluated more harshly in a subjective evaluation process" may support a reasonable inference of discrimination. *Id.* at 61.

Mr. Ako-Annan was a unique employee several times over.  He was the only Black primary care practice manager at EMMC, the only male primary care practice manager, and the only Black employee at the Orono Practice.   Precedent acknowledges that an employee may be evaluated more harshly under these circumstances. *Thomas*, 183 F.3d at 61.  Here, the record provides some support for Mr. Ako-Annan's claim that he was evaluated more harshly than the white female practice managers.  For example, when Ms. Ashe would meet with Mr. Ako-Annan, she would interrogate him, rather than work collaboratively.  PSAMF ¶ 129(d); DRPSAMF ¶ 129(d).  Mr. Ako-Annan has raised enough evidence in this record to create a genuine issue of fact as to whether Ms. Ashe's behavior toward him was very different from her behavior toward the white female practice managers, the female providers in the Orono Practice, and the female staff at the Orono Practice.  PSAMF ¶ 129(d).  Under the circumstances, a jury could reasonably conclude Ms. Ashe harbored implicit race and sex-based bias toward Mr. Ako-Annan and that bias colored her evaluation and treatment of him.

Ms. Ashe's comments to Mr. Ako-Annan could further support a finding that she harbored discriminatory animus based on his race and sex. *Pl.'s Opp'n* at 14-15.

Comments by a decision maker "close in time to the alleged adverse action can be probative" of discrimination. *Burns v. Johnson*, 829 F.3d 1, 12 (1st Cir. 2016) (citing *Santiago-Ramos*, 217 F.3d at 55). Mr. Ako-Annan argues three statements by Ms. Ashe could support a finding of discriminatory animus: (1) her statement during Mr. Ako-Annan's 2016 performance review that he should look for work elsewhere at EMMC, (2) her statements about having a Black foster child, and (3) her email to Mr. Reid that Mr. Ako-Annan's repeated requests to discuss diversity were "becoming uncomfortable." *Pl.'s Opp'n* at 14-15.

While Ms. Ashe's statements are not unambiguous evidence of discrimination, a jury could still reasonably find the statements are probative of racial discrimination when taken as a whole. As for the first statement, a jury might find the statement shows Ms. Ashe held Mr. Ako-Annan in high regard by encouraging him to seek a promotion. At the same time, when viewed alongside other facts, such as Ms. Ashe's exclusive hiring of white female practice managers, the statement could support the inference that Ms. Ashe hoped Mr. Ako-Annan would leave his job because she preferred to work with white women. Federal law endows the jury with the duty to determine which of these competing interpretations is correct.

The significance of the statements about Ms. Ashe's foster child is also a matter of interpretation. Perhaps, as EMMC suggests, a jury would conclude the statements are "insensitive" but fail to establish that Mr. Ashe had racial animus toward Mr. Ako-Annan. *Def's Mot.* at 12. At the same time, a jury might decide context is important. While arguably innocuous in isolation, the statements may be inculpatory

in context.  Ms. Ashe first referenced her foster child in December 2016, when Mr. Ako-Annan questioned the accuracy of his performance review and raised concerns that Ms. Ashe was applying a race or sex-based double standard to him.  DSMF ¶ 4; PRDSMF ¶ 4; PSAMF ¶ 111; DRPSAMF ¶ 111.  Ms. Ashe first responded by questioning Mr. Ako-Annan's intelligence.  DSMF ¶ 4; PRDSMF ¶ 4.  Then, even though Ms. Ashe understood Mr. Ako-Annan was perceiving some unfairness because of his race or gender, she quickly rejected Mr. Ako-Annan's concerns because of her foster child's race.  DSMF ¶ 4; PRDSMF ¶ 4; PSAMF ¶ 111; DRPSAMF ¶ 111.

Ms. Ashe made a similar statement on May 22, 2017, when she met with Mr. Ako-Annan to discuss her first investigation into the complaints against him.  DSMF ¶ 15; PRDSMF ¶ 15; DSMF ¶ 21; PRDSMF ¶ 21.  Mr. Ako-Annan again accused Ms. Ashe of holding him to a different standard than the other practice managers and treating him in a racist manner.  DSMF ¶¶ 17-18; PRDSMF ¶¶ 17-18; PSAMF ¶ 114; DRPSAMF ¶ 114.  In response, Ms. Ashe said "my foster child is Black, so don't talk to me about discrimination."  DSMF ¶ 21; PRDSMF ¶ 21.  Viewing these two instances in context, a jury could reasonably conclude Ms. Ashe's immediate resistance to Mr. Ako-Annan's concerns about race and sex discrimination and her failure to take his concerns seriously are probative of race-based animus.

Much the same can be said about Ms. Ashe's December 2016 email to Mr. Reid expressing that Mr. Ako-Annan's repeated attempts to talk about diversity were "becoming uncomfortable."  On the one hand, a reasonable jury may interpret this statement as expressing non-animus-driven discomfort with discussing race in the

workplace. However, a jury could just as easily construe Ms. Ashe's email as evidence of race-based hostility to Mr. Ako-Annan's concerns about discrimination.

In addition to arguing that the foregoing facts support a finding that Ms. Ashe acted with discriminatory animus, Mr. Ako-Annan argues that a jury could reasonably find race and sex-based animus because Ms. Ashe "was setting Mr. Ako-Annan up for failure and applying different standards to him." *Pl.'s Opp'n* at 16. He also challenges that Ms. Ashe blaming Mr. Ako-Annan for "performance issues" beyond his control "may demonstrate" pretext. *Id.* at 17-18. The Court declines to specifically address these arguments because other facts establish a genuine dispute of material fact as to whether Ms. Ashe harbored race and sex-based animus toward Mr. Ako-Annan.

### b.   "Cat's Paw" Analysis

There is also a genuine issue of material fact as to whether Ms. Worster acted as a conduit for Ms. Ashe's potential race and sex-based prejudice. "Cat's paw liability requires at a minimum that the act motivated by [discriminatory animus] be the 'proximate cause of the ultimate employment action.'" *Theidon*, 948 F.3d at 508 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)).

EMMC contends that Mr. Ako-Annan cannot satisfy this standard. *Def.'s Reply* at 7. Fixating on Ms. Ashe's comments, EMMC submits that "mere generalized 'stray remarks,' arguably probative of bias against a protected class, normally are not probative of pretext absent some discernible evidentiary basis for assessing their temporal and contextual relevance." *Id.* (quoting *Straughn v. Delta Air Lines, Inc.*,

250 F.3d 23, 36 (1st Cir. 2001)).   EMMC argues Mr. Ako-Annan "can show no connection whatsoever – temporal or contextual – between comments Ashe made in 2017 and Worster's decision to terminate [Mr. Ako-Annan] in 2019." *Id.*

The Court is not persuaded.  Ms. Ashe is the obvious connection between her comments in 2016 and 2017 and Mr. Ako-Annan's firing in 2019.  Her comments were not stray remarks by an individual completely detached from the decision to terminate Mr. Ako-Annan. *Compare Burns*, 829 F.3d at 12 (reasoning that a decision maker's comments were probative evidence of discrimination where they were made in the context of a decision-making meeting and with a condescending tone), *with Ray*, 799 F.3d at 116 (finding racially derogative comments by law firm partners were insufficiently connected to failure to promote claim because those partners were not on the promotion committee and the actual decision makers were not aware of the offensive comments).  On the contrary, Ms. Ashe was one of only two individuals Ms. Worster asked to investigate the 2019 complaints against Mr. Ako-Annan.  DSMF ¶ 59; PRDSMF ¶ 59; PSAMF ¶ 229; DRPSAMF ¶ 229.  She was arguably the lead investigator.  As discussed, a jury could reasonably conclude Ms. Ashe had race and sex-based animus toward Mr. Ako-Annan in 2016 and 2017 because of her statements, lack of diversity in hiring, and possible implicit bias.  Despite the distance between the comments and Ms. Ashe's investigation into Mr. Ako-Annan, a reasonable jury could find she harbored the same prejudice only two years later during the 2019 investigation.

Before firing Mr. Ako-Annan, Ms. Worster reviewed notes that Ms. Ashe prepared during the 2019 investigation.   DSMF ¶ 61; DSMF ¶ 62; DSMF ¶ 63; PRDSMF ¶ 63.   These notes included numerous complaints from staff and providers at the Orono Practice about Mr. Ako-Annan.   DSMF ¶ 61; DSMF ¶ 62; DSMF ¶ 63; PRDSMF ¶ 63.   The version of events Ms. Ashe relayed to Ms. Worster may have been skewed to further Ms. Ashe's potential discriminatory animus.   At this stage, it bears emphasis that Ms. Ashe's notes are not in the summary judgment record for their truth, but to show the information Ms. Worster reviewed before firing Mr. Ako-Annan.   Given the jury triable issue on Ms. Ashe's discriminatory animus, there is also a jury triable issue on whether the information she relayed to Ms. Worster was tainted by discriminatory animus, and whether any tainted information was the proximate cause of Mr. Ako-Annan's firing.   These genuine disputes of material fact, among others, preclude summary judgment in EMMC's favor.

## B.   The Maine Whistleblower Protection Act Claims

The Court turns next to Mr. Ako- Annan's claims under the MWPA.   First, EMMC contends it is entitled to summary judgment because no reasonable jury could conclude Mr. Ako-Annan engaged in the protected activity of reporting "FMLA fraud" and that, even if he could, Mr. Ako-Annan has not proffered sufficient evidence that any such report was the reason for his termination.   *Def.'s Mot.* at 14-16.   Second, EMMC submits that Mr. Ako-Annan's reporting to Ms. Ashe that Dr. R was overprescribing opioids was not a protected activity because Mr. Ako-Annan had no personal knowledge to that effect and was repeating unsubstantiated rumors.   *Id.*

at 16-17.   EMMC further challenges there is no evidence that Mr. Ako-Annan's voicing of these concerns caused his firing.  *Id.* at 17.

### 1.   Legal Standard

To prevail on his MWPA claim, Mr. Ako-Annan must prove three elements: "(1) [he] engaged in activity protected by the statute; (2) [he] was the subject of an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action." *Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142 ¶ 6, 954 A.2d 1051, 1053.  The Law Court no longer applies *McDonnell Douglas* burden shifting to MWPA claims; however, the plaintiff must still "adduce precisely the same quantum of proof . . . to defeat summary judgment." *Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 350 (1st Cir. 2018) (citing *Brady v. Cumberland Cty.*, 2015 ME 143, ¶ 39, 126 A.3d 1145, 1158).  The dispositive question is whether the plaintiff's evidence "support[s] an inference 'that the adverse employment action was motivated at least in part by the protected activity.'"  *Id.* at 351 (quoting *Brady*, 2015 ME 143, ¶ 38, 126 A.3d at 1158).

### 2.   Analysis

The parties' dispute turns on whether Mr. Ako-Annan proffered sufficient evidence to permit a jury finding that he engaged in MWPA protected activities and, if so, whether a reasonable jury could conclude his participation in protected activities caused his firing.  The Court concludes there are genuine issues of material fact regarding whether Mr. Ako-Annan engaged in protected activities and whether those

protected activities contributed to his termination. Therefore, the Court denies EMMC's motion for summary judgment.

### a. Protected Activity

Relevant to Mr. Ako-Annan's case, the MWPA defines protected activity as follows:

> A. The employee, acting in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States;

26 M.R.S. § 833(1)(A). Specifically, Mr. Ako-Annan claims he engaged in protected activities when he reported to Ms. Ashe that Dr. R was overprescribing opioids and engaging in FMLA fraud. *Pl.'s Opp'n* at 18-20. Mr. Ako-Annan does not argue that he engaged in protected activities under any other provision of the MWPA. *Id.*

The "critical point when analyzing whether a plaintiff has made out the first element of a [MWPA] claim . . . is an employee's motivation in making a particular report or complaint." *Harrison v. Granite Bay Care, Inc.*, 811 F.3d 36, 51 (1st Cir. 2016). "A complaint is made in good faith if the employee's motivation is to stop a [violation of law]." *Cormier v. Genesis Healthcare LLC*, 2015 ME 161, ¶ 11, 129 A.3d 944, 949. Reasonable cause requires that the employee have "a subjective and objectively reasonable belief that [a violation of law] exists." *Id.*

### i. FMLA Fraud

There is a genuine dispute of material fact as to whether Mr. Ako-Annan engaged in a protected activity by reporting FMLA fraud to Ms. Ashe. The record

establishes that Mr. Ako-Annan knew FMLA fraud was a legal issue and reported Dr. R to Ms. Ashe for FMLA fraud.  PSAMF ¶ 181; DRPSAMF ¶ 181; PSAMF ¶ 185; DRPSAMF ¶ 185.  On these facts, a jury could reasonably conclude Mr. Ako-Annan subjectively believed Dr. R was violating the law, and that Mr. Ako-Annan intended to stop the violation.[99]

EMMC's contention that it is entitled to summary judgment because Mr. Ako-Annan reported the suspected FMLA fraud for self-serving reasons lacks merit.  *See Def.'s Mot.* at 15.  Two different things may be true simultaneously.  An employee may report legal violations to his employer both because he wants to stop the legal violations and because his job will be easier if the lawbreaking stops.  EMMC cited no authority for the proposition that a self-interested whistleblower cannot invoke the MWPA's protections.  The Court found none.  In fact, caselaw directly refutes EMMC's position.  *See Pippin v. Boulevard Motel Corp.*, 835 F.3d 180, 183-84 (1st Cir. 2016) (explaining that a MPWA plaintiff "need only show that [the] report was made to shed light on and in opposition to [the defendant's] potential illegal acts") (citation and quotation marks omitted).  Therefore, there is a genuine issue of material fact as to whether Mr. Ako-Annan engaged in a protected activity by reporting FMLA fraud.

### ii.    Opioid Overprescribing

The Court further concludes there is a genuine issue of material fact as to whether Mr. Ako-Annan engaged in a protected activity by reporting rumors about

---

[99]    EMMC does not move for summary judgment on the basis that Mr. Ako-Annan's subjective belief about FMLA fraud was objectively unreasonable.

Dr. R overprescribing opioids. EMMC's motion for summary judgment argues no reasonable jury could conclude Mr. Ako-Annan reported these concerns in good faith or had an objectively reasonable belief that Dr. R was overprescribing opioids. *Def.'s Mot.* at 16-17. In support, EMMC notes that Mr. Ako-Annan had no first-hand knowledge Dr. R was overprescribing opioids, only passed on rumors about conduct at Dr. R's prior place of employment, and that Dr. R has never been flagged at EMMC for opioid prescription practices. *Id.* at 16-17.

As Mr. Ako-Annan sees it, EMMC is not telling the full story. *Pl.'s Opp'n* at 19. Although Mr. Ako-Annan lacked personal knowledge that Dr. R was overprescribing opioids, Mr. Ako-Annan relayed information from Dr. R's former medical assistant. DSMF ¶ 46; PRDSMF ¶ 46. Moreover, Mr. Ako-Annan told Ms. Ashe that a medical assistant at the Orono Practice informed him that one of Dr. R's patients was coming from a neighborhood where drug sales occurred, and that the patient was doing drugs. PSAMF ¶ 192; DRPSAMF ¶ 192.

Viewing these facts in the light most favorable to Mr. Ako-Annan would permit a reasonable jury to conclude that Mr. Ako-Annan had a subjective and objectively reasonable belief that Dr. R was overprescribing opioids. A jury could find Mr. Ako-Annan's belief objectively reasonable because he received the information from individuals who worked directly with Dr. R. Additionally, as Dr. R's conduct would potentially implicate controlled substances laws, Mr. Ako-Annan has shown a jury-triable issue as to whether reporting his concerns to Ms. Ashe was a protected activity under the MWPA. *Accord Gammon v. Crisis & Counseling Ctrs., Inc.*, 762 F. Supp.

2d 165, 184 (D. Me. 2011) (noting that "the MWPA does not require that the 'reported condition, activity, or practice actually *be* unsafe or illegal; . . . an employee's reasonable belief that it crosses the line suffices, as long as the complainant communicates that belief to this employer in good faith'") (quoting *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261-62 (1st Cir. 1999)).

### b.    Causation

There is also a genuine issue of material fact regarding causation. "An employee's protected activity is causally connected to the adverse employment action 'when the alleged retaliation was a substantial, even though perhaps not the only, factor motivating the adverse employment action.'" *Johnson v. York Hosp.*, 2019 ME 176, ¶ 23, 222 A.3d 624, 631 (quoting *Brady*, 2015 ME 143, ¶ 14, 126 A.3d at 1153). "[O]n a motion for summary judgment the lack of temporal proximity" between an employee's protected activity and termination "is not, as a matter of law, a dispositive factor." *Brady*, 2015 ME 143, ¶ 23, 126 A.3d at 1154.

EMMC contends summary judgment is proper on Mr. Ako-Annan's MWPA claims because no reasonable jury could conclude his alleged protected activities caused his termination. *Def.'s Mot.* at 16-17. Mr. Ako-Annan responds that three facts establish a genuine dispute of material fact about causation: (1) Dr. R knew Mr. Ako-Annan had reported FMLA fraud concerns and opioid prescription concerns, (2) on March 29, 2019, Dr. R told Ms. Ashe that he was disappointed Mr. Ako-Annan would remain the practice manager after the investigation, and (3) Ms. Ashe told Ms.

Worster about Dr. R's views and Mr. Ako-Annan was fired shortly thereafter. *Pl.'s Opp'n* at 20.

On balance, Mr. Ako-Annan is right. The Court does not dispute EMMC's contention that evidence of retaliation is thin. The lone connection between Mr. Ako-Annan's potentially protected activities and his termination is Dr. R's March 29, 2019 phone call with Ms. Ashe, in which Dr. R did not, at least according to the present record, mention that Mr. Ako-Annan had previously reported him. PSAMF ¶ 199; DRPSAMF ¶ 199. Moreover, the ultimate decisionmaker, Ms. Worster, knew of Dr. R's views. PSAMF ¶ 200; DRPSAMF ¶ 200. More than a year had passed between when Mr. Ako-Annan reported his concerns about Dr. R's potential FMLA fraud and opioid overprescribing to Ms. Ashe in early 2018, and when EMMC fired him in April 2019. Even so, as a matter of law, this passage of time is not dispositive of causation. *Brady*, 2015 ME 143, ¶ 23, 126 A.3d at 1154.

Even though EMMC argues that Mr. Ako-Annan's causal chain is weak, its evidentiary strength must be tested and resolved by a factfinder, not this Court. In the Court's view, therefore, viewed in a light most favorable to Mr. Ako-Annan, his alleged causal chain survives summary judgment. There is a genuine issue of material fact as to whether Dr. R harbored a retaliatory motivation when he complained to Ms. Ashe that it appeared Mr. Ako-Annan would not be fired. There is also a genuine issue of material fact as to whether Ms. Worster acted as a conduit for Dr. R's potential retaliation by firing Mr. Ako-Annan. Summary judgment is

improper because EMMC identified no record evidence that would definitively resolve these factual questions in its favor.

## VI.  CONCLUSION

The Court DENIES Eastern Maine Medical Center's Motion for Summary Judgment (ECF No. 29).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 20th day of August, 2021